# In the
# United States Court of Appeals
## for the Fifth Circuit

### SYLVIA GONZALEZ,

*Plaintiff–Appellee,*

*v.*

### EDWARD TREVINO, II, Mayor of Castle Hills, sued in his individual capacity; JOHN SIEMENS, Chief of the Castle Hills Police Department, sued in his individual capacity; ALEXANDER WRIGHT, sued in his individual capacity,

*Defendants–Appellants.*

On Appeal from the United States District Court for the
Western District of Texas, San Antonio Division, No.5:20-cv-01151,
Honorable David Alan Ezra, Presiding

---

## APPELLEE'S PETITION FOR REHEARING EN BANC

---

Anya Bidwell, *Lead Counsel*
Patrick Jaicomo
William Aronin
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320

*Counsel for Plaintiff–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

(1)     Case Number 21-50276: *Gonzalez v. Trevino, et al.*

(2)     The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualifications or recusals.

| Defendants–Appellants | Counsel for Defendants–Appellants |
|---|---|
| Edward Trevino, II; John Siemens; and Alexander Wright | DENTON NAVARRO ROCHA BERNAL & ZECH <br> Scott Michael Tschirhart <br> Lowell F. Denton |

| Plaintiff–Appellee | Counsel for Plaintiff–Appellee |
|---|---|
| Sylvia Gonzalez | INSTITUTE FOR JUSTICE <br> Anya Bidwell <br> Patrick Jaicomo <br> William Aronin |

/s/ Anya Bidwell
*Lead Counsel for Plaintiff–Appellee*

## RULE 35(b)(1) STATEMENT

In my professional judgment, the issue on appeal satisfies the criteria of Rule 35(b)(1) for three reasons. First, this is an issue of first impression in this circuit. Second, the panel majority reached a conclusion that is contrary to the Supreme Court precedent *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) and *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). Third, the panel majority needlessly split the Fifth Circuit from the Seventh Circuit's decision *Lund v. City of Rockford*, 956 F.3d 938 (7th Cir. 2020).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .........................................i

RULE 35(b)(1) STATEMENT ..................................................ii

TABLE OF CONTENTS ...................................................... iii

TABLE OF AUTHORITIES..................................................iv

STATEMENT OF THE ISSUE MERITING EN BANC REVIEW...........1

INTRODUCTION AND BACKGROUND..................................................2

STATEMENT OF THE COURSE OF PROCEEDINGS .........................6

ARGUMENT AND AUTHORITIES .........................................9

    I.   *Lozman* and not *Nieves* governs in cases involving
        premeditated and deliberative conduct......................................9

        A. *Nieves* utilizes probable cause as a useful proxy for
           dealing with typical retaliatory arrest claims that
           involve on-the-spot decisions to arrest.............................10

        B. Probable cause becomes just one piece of objective
           evidence in a retaliatory arrest case, like *Lozman*,
           that involves a months-long retaliation campaign. .........13

    II.  If *Nieves* controls, the panel gets *Nieves* wrong........................16

CONCLUSION ....................................................20

CERTIFICATE OF SERVICE.................................................21

CERTIFICATE OF COMPLIANCE.......................................22

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Hoggard v. Rhodes,*
    141 S. Ct. 2421 (2021)................................................................5

*Lozman v. City of Riviera Beach,*
    138 S. Ct. 1945 (2018)..................................................... *passim*

*Lund v. City of Rockford,*
    956 F.3d 938 (7th Cir. 2020).............................................7, 18

*Nieves v. Bartlett,*
    139 S. Ct. 1715 (2019)..................................................... *passim*

*Villareal v. City of Laredo,*
    44 F.4th 363 (5th Cir. 2022) .............................................5, 13

**CODES**

Tex. Penal Code § 37.10(a)(3)..............................................1, 17

# STATEMENT OF THE ISSUE MERITING EN BANC REVIEW

Appellee Sylvia Gonzalez spearheaded a nonbinding petition criticizing her town's city manager. In response, appellants Trevino, Siemens, and Wright designed and executed a retaliation campaign against her, which included a prolonged investigation into whether Sylvia tried to steal the petition she championed, an arrest for a nonviolent misdemeanor based on a statute that has never before (or since) been used to charge someone for the same or similar conduct, and attempts to remove her from her council seat.

The issue meriting en banc review is whether, under either *Lozman v. City of Riviera Beach* or *Nieves v. Bartlett*, the existence of probable cause defeats a First Amendment retaliatory arrest claim against individual defendants who participate in a deliberative, premeditated, weeks-long scheme resulting in an arrest even where the plaintiff establishes that the statute under which she was arrested has never been used to prosecute anything remotely analogous.

# INTRODUCTION AND BACKGROUND

Appellee Sylvia Gonzalez—a 72-year-old councilwoman with not so much as a traffic offense to her name—was jailed under a statute criminalizing tampering with a government record[1] for allegedly trying to steal a petition urging the removal of a city manager. ROA.6–7. Paradoxically, Sylvia was the petition's most vocal champion. ROA.9.

Sylvia's arrest was orchestrated by allies of the city manager: the mayor, who selected the city manager; the chief of police, who was appointed by the city manager; and a "special detective," a local attorney and friend of the chief of police. ROA.16–19. Moreover, the basis for the arrest warrant secured by appellants explicitly rested on Sylvia's viewpoints, alleging in the supporting affidavit that Sylvia (1) "has been openly antagonistic to the city manager . . . wanting desperately to get him fired," (2) that "[p]art of her plan . . . involved collecting signatures on several petitions to that effect," and (3) that she "had personally gone to [a resident's] house . . . to get her signature on one of the petitions under false pretenses, by misleading her, and by telling her several fabrications about [the city manager]." ROA.21.

---

[1] Tex. Penal Code § 37.10(a)(3).

Appellants then used a highly irregular procedure to ensure that Sylvia was jailed (instead of being issued summons or processed inside a courtroom—typical for nonviolent, first-time misdemeanants), circumventing the Bexar County district attorney who dismissed the charges as soon as he got involved. ROA.20. Sylvia sued appellants for this brazen act of retaliation. Her claim alleged more "governmental action than simply an arrest," *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018), including a months-long investigation leading up to the arrest and attempts to remove Sylvia from her council seat. ROA.18–23.

"[T]here's zero difficulty or complexity in figuring out whether it was animus or [Sylvia's] purportedly criminal conduct that caused her arrest." Op.28 (Oldham, J., dissenting). But because Sylvia did not challenge the existence of probable cause for her arrest, the panel majority nonetheless determined that Sylvia's claim was dead on arrival. Op.8.

Probable cause should not blind the courts to obvious retaliation. When the Supreme Court announced that the existence of probable cause generally bars retaliatory arrest claims, it did not approve the use

of pretextual arrests to extinguish First Amendment rights. Rather, it addressed a very particular problem: what to do with "special challenges" faced by police in rapidly evolving situations, especially when "protected speech [or conduct] is . . . a legitimate consideration [for] deciding whether to make an arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1720, 1724 (2019). "*For these reasons,*" the Court explained, "retaliatory arrest claims *can* 'present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury,'" creating a risk "that the courts will be flooded with dubious retaliatory arrest suits," mired in "the complexity of proving (or disproving) causation." *Lozman*, 138 S. Ct. at 1953 (emphasis added).

In situations outside of on-the-spot policing, however, plaintiffs often have other objective evidence available to help untangle proper and improper motives. *Id*. at 1954. As such, probable cause becomes just one among many factors for courts to take into account.

Sylvia's case fits comfortably in the latter class of retaliatory arrest cases. According to her complaint, appellants developed a sophisticated, premediated plan that took over two-and-a-half months to execute and eventually led to Sylvia's arrest. ROA.16–28. As in

*Lozman*, Sylvia alleged much more than simply an arrest, including a prolonged and intrusive investigation, as well as efforts to remove her from the city council. Moreover, just like in *Lozman*, there is a paper trail of appellants' retaliatory intent. ROA.19–20.

Importantly, even if *Lozman*'s class of retaliatory arrest claims were cabined to claims against municipalities—as the majority suggests, Op.10, Sylvia met her burden to overcome the probable cause requirement through satisfying *Nieves*'s so-called jaywalking exception. Specifically, Sylvia collected a decade's worth of Bexar County data, establishing that even though misplacing papers during legislative sessions is obviously common, no one has ever been arrested for it. ROA.22. This is precisely the scenario illustrated by the jaywalking example in *Nieves*. 139 S. Ct. at 1727. The majority's interpretation of the *Nieves* exception as only allowing comparative evidence—as opposed to other objective evidence—ensures that even the hypothetical jaywalker wouldn't get his day in court. Op.27 (Oldham, J., dissenting). It also needlessly creates a circuit split. Op.8.

Fundamentally however, by applying the *Nieves* probable cause requirement to Sylvia, the panel turned a blind eye on "the unabashedly

selective behavior of the law enforcement officials here," who "weaponize[d] the justice system to punish their political opponents." *Villareal v. City of Laredo*, 44 F.4th 363, 382 (5th Cir. 2022) (Ho, J., concurring). Because appellants in this case "disapprove[d]" of Sylvia's message, they "use[d] every means at [their] disposal to stop [her] from saying it." *Id.* (internal citation omitted). They now hide behind probable cause to escape accountability, demanding the same protection that police officers get when they "make[] a split-second decision to use force in a dangerous setting." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of certiorari). This Court should not countenance such a dangerous mechanism to override First Amendment protections. It should grant this petition for rehearing en banc and reverse the panel majority.

## STATEMENT OF THE COURSE OF PROCEEDINGS

Appellee Sylvia Gonzalez filed her First Amendment retaliation complaint on September 29, 2020. ROA.6. She sued individual defendants—appellants Trevino, Siemens, and Wright—as well as the

municipality of Castle Hills.[2] ROA.30; ROA.33. In her complaint, Sylvia provided detailed allegations of a premeditated retaliation campaign organized and executed by individual defendants—allies of the city manager. ROA.16–28.

Appellants filed a motion to dismiss based on qualified immunity, which the district court denied, ROA.193, prompting appellants to file this interlocutory appeal. ROA.220.

In a 2-1 opinion on an issue of first impression in this circuit, the panel held that probable cause foreclosed Sylvia's First Amendment claim. Op.1. The panel issued a two-part decision to reverse the district court. First, according to the majority, *Lozman* only applies to municipal liability and never individual liability. Op.10. Second, *Nieves* requires courts to dismiss every First Amendment claim arising from an arrest made with probable cause, unless a plaintiff could "squeeze[] through the crack of an opening that *Nieves* left ajar" and point to other people engaged in the same conduct who were not arrested. Op.8 (internal citation omitted). Bexar County arrest data, collected by

---

[2] Sylvia's First Amendment retaliation claim against the municipality, which survived the motion to dismiss and could not be interlocutorily appealed, is not at issue in this petition. **That claim is stayed pending the outcome of this appeal.** **ROA.224.**

Sylvia, demonstrating that "virtually everyone prosecuted under [the Texas] statute was prosecuted for conduct different from hers," was not enough to make this showing. Op.26. The panel acknowledged that this conclusion split the Fifth Circuit from the Seventh Circuit's decision *Lund v. City of Rockford*, 956 F.3d 938 (7th Cir. 2020). Op.8.

In dissent, Judge Oldham disagreed with both holdings. First, he concluded, *Lozman*, not *Nieves*, is "the most relevant precedent here." Op.27. *Lozman* "involved materially identical facts to ours," with allegations of "more governmental action than simply an arrest," involving a premeditated and deliberative scheme and plenty of objective evidence to untangle proper and improper motives. Op.29–30. *Nieves*, on the other hand, dealt with "on-the-spot decision[s] by [] individual officer[s]." Op.29.

Second, even if *Nieves* did control, Sylvia presented objective evidence sufficient to overcome the probable cause requirement. Op.31. That evidence included Bexar County felony and misdemeanor data showing that over the past decade, Sylvia was the only person who misplaced government documents during an official meeting and was arrested for it. In Judge Oldham's view, "just because Sylvia's evidence

requires an inference doesn't mean it isn't evidence sufficient to meet *Nieves*." Op.32 n.7.

## ARGUMENT AND AUTHORITIES

En banc review should be granted because Judge Oldham is right on both points. First, the panel majority misinterpreted *Lozman*, which says that probable cause to arrest is not a complete defense to liability for this sort of premeditated campaign of retaliation. And second, the panel majority incorrectly held (in conflict with the Seventh Circuit) that the Supreme Court's decision in *Nieves* imposes an all-but-insurmountable evidentiary burden on plaintiffs like Sylvia. This amounts to the panel majority **wrongly construing two of the Supreme Court's most recent—and important—retaliatory arrest precedents and warrants en banc review.**

## I. *Lozman* **and not** *Nieves* **governs in cases involving premeditated and deliberative conduct.**

Contrary to the panel majority's opinion, *Lozman* and not *Nieves* controls Sylvia's retaliatory arrest claim. That's because *Nieves*'s rule is designed specifically for First Amendment retaliation cases involving law-enforcement officers making on-the-spot decisions to arrest, often by considering arrestee's speech. *See* Op.27 (Oldham, J., dissenting)

(discussing how the *Nieves* probable cause requirement was designed "to accommodate the necessities of split-second decisions to arrest"). Sylvia's case—while it can technically be described as involving a "retaliatory arrest claim[]," *Nieves*, 139 S. Ct. at 1726—is different. It does not involve an arresting officer; it has nothing to do with split-second decision-making; and nothing in the nature of the offense for which Sylvia was charged required appellants to take her speech into account when determining whether probable cause existed for her arrest. Simply labeling it as a retaliatory arrest case should not leave appellants off the hook.

The Supreme Court has decided just one retaliatory arrest case that's like Sylvia's: *Lozman*. And *Lozman*, not *Nieves*, governs.

## A. *Nieves* utilizes probable cause as a useful proxy for dealing with typical retaliatory arrest claims that involve on-the-spot decisions to arrest.

The Supreme Court in *Nieves* designed the probable cause rule to accommodate split-second decision-making by police, not premeditated, deliberative schemes that take months to execute.[3] In the Court's view,

---

[3] Perhaps for that reason, the words "officials" and "official" only appear outside of the sections explaining the probable cause rule. *Nieves*, 139 S. Ct. at 1723–1727. Inside these probable cause sections, it is all about ensuring that "officers" have

this rule for such "typical retaliatory arrest claim[s]" was needed to ensure police are not dragged through courts for appropriately taking speech into account when making on-the-spot calls to arrest. *Nieves*, 139 S. Ct. at 1722 (internal quotation omitted); *see also id.* at 1725 (describing the rule as "ensur[ing] that officers may go about their work without undue apprehension of being sued"). "[T]he content and manner of a suspect's speech may convey vital information—for example, if he is ready to cooperate or rather presents a continuous threat." *Id.* at 1724 (cleaned up); *see also Lozman*, 138 S. Ct. at 1953. When officers are sued for such actions, "retaliatory arrest claims . . . can 'present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury.'" *Lozman*, 138 S. Ct. at 1953. And there is not much to go on, other than "allegations about an arresting officer's mental state." *Nieves*, 139 S. Ct. at 1725.

To accommodate this causal complexity, the Supreme Court in *Nieves* created a rule that requires plaintiffs to plead more than subjective "state of mind" allegations. *Id.* They "must also prove as a

---

room to effectuate proper arrests, on the one hand, and that "police officers" not abuse their arrest power, on the other. *Id.* at 1725, 1727.

threshold matter that the decision . . . was objectively unreasonable because it was not supported by probable cause." *Id.*

It is easy to make sense of such a rule. In situations involving day-to-day police work, the presence or absence of probable cause is readily ascertainable and "speaks to the objective reasonableness of an arrest." *Id.* at 1724–25. If there is no probable cause to arrest someone as they speak, it likely means that this speech was the cause of the arrest. *Id.* at 1725. But if there is probable cause for an arrest, it is likely that the arrest would have occurred even without the retaliatory motive. *Id.*

*Nieves* involved precisely the type of split-second arrests routinely performed by law enforcement. Two police officers, working at an extreme sporting event, arrested a heavily intoxicated and belligerent attendee who was urging other members of the public to not cooperate with them. *Id.* at 1720–21. The officers "perceived [this attendee] to be a threat based on a combination of the content and tone of his speech, his combative posture, and his apparent intoxication." *Id.* at 1724. "[B]ecause protected speech [was] a 'wholly legitimate consideration'" for these two officers having to make such "split-second judgments", it was "particularly difficult to determine whether the adverse

government action was caused by the [officers'] malice or the plaintiff's potentially criminal conduct." *Id.* For this reason, probable cause supplied objective evidence that the arrest would have occurred even without the retaliatory motive and barred the attendee's suit. *Id.*

### B. Probable cause becomes just one piece of objective evidence in a retaliatory arrest case, like *Lozman*, that involves a months-long retaliation campaign.

*Nieves*'s rule is driven by "causal complexities" present in day-to-day policing. *Id.* at 1723. When such complexities don't exist —meaning there is plenty of objective evidence to untangle proper and improper motives in claims for retaliatory arrests—probable cause becomes only one piece of the puzzle and its value as a proxy plummets. *Id.* at 1727.

*Lozman* is a great example of this dynamic. After being arrested for speaking critically at a city council meeting, Fane Lozman, just like Sylvia, did not challenge the existence of probable cause. But because his retaliation claim involved more governmental action than simply an arrest, the Court had additional objective evidence to work with, which enabled the Court to recognize the claim.

For example, there was a transcript from a closed-door council meeting, where council members resolved to "intimidate" Lozman and

others for filing a lawsuit against the city. *Lozman*, 138 S. Ct. at 1949. There was also a lawsuit that the city initiated against Lozman. *Id.* at 1950. Most importantly, the Court distinguished Lozman's case on the ground that it was not "an ad hoc, on-the-spot decision by an individual officer" and "the connection between the alleged animus and injury" was not "weakened by an official's legitimate consideration of speech." *Id.* at 1954 (cleaned up); *see also id.* ("[I]t is difficult to see why a city official could have legitimately considered that Lozman had, months earlier, criticized city officials or filed a lawsuit against the City.").

As Judge Oldham wrote in his dissent, Sylvia's case "involve[s] materially identical facts" to *Lozman*, making it imperative that her case too is allowed to proceed. Op.29. To begin with, Sylvia did not sue the officer who initially investigated her or booked her into jail. Like Lozman, she sued the group who "weaponize[d] the justice system" from the comfort of their government offices. *Villareal*, 44 F.4th at 382 (Ho, J., concurring). In addition, like Lozman, Sylvia alleged more governmental actions than an arrest, including appellants' efforts to punish and intimidate her by investigating her, going out of their way to jail her, and trying to remove her from her council seat. Like Lozman,

too, she presented the court with a document, an affidavit for her arrest, written by one of the appellants and on its face listing Sylvia's viewpoints as facts warranting her arrest. Op.22. Finally, like Lozman, Sylvia was charged with a crime—tampering with a government record—that had no relation to her speech criticizing the city manager.

The panel majority held that *Lozman* does not control here because it was a municipal liability case. Op.10. While the Supreme Court did limit *Lozman* to "arrests that result from official policies of retaliation," *Nieves*, 139 S. Ct. at 1722, that was only because Lozman brought his case against a municipality under *Monell*. And since it is "well established that a § 1983 case" against a city cannot proceed "unless the harm was caused in the implementation of 'official municipal policy,'" the Court "assume[d] . . . that the arrest was taken pursuant to an official city policy." *Lozman*, 138 S. Ct. at 1951. In other words, *Lozman* is not cabined to municipal liability simply because the facts in the case happened to involve municipal liability. Had Lozman brought his case against individual councilmembers and presented the same evidence, the exact same reasoning would have applied. After all, the justification the Court used to allow Lozman's case to proceed was

that it did not implicate the "causal complexities" presented in day-to-day policing. Neither does Sylvia's.

## II.    If *Nieves* controls, the panel gets *Nieves* wrong.

Even if *Nieves* controls here and Sylvia is obligated to present "objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," 139 S. Ct. at 1727, Sylvia has met this burden. By ruling otherwise, the majority changed *Nieves* beyond recognition, creating a new standard that (1) contravenes the Supreme Court precedent and (2) deprives litigants of their rightful day in court, making the grant of en banc review exceptionally important.

In *Nieves*, the Supreme Court acknowledged that there are "circumstances where officers have probable cause to make arrests, but typically exercise their discretion to not do so." *Id.* Wary that "an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech,'" the Supreme Court announced what is now commonly known as the jaywalking exception: "[T]he no-probable-cause requirement should not apply when a plaintiff presents objective

evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

For example, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking," at an intersection where "jaywalking is endemic but rarely results in an arrest . . . probable cause does little to prove or disprove the causal connection between animus and injury." *Id.* "[T]o dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest" in such circumstances "would seem insufficiently protective of First Amendment rights." *Id.*

Sylvia's case fits comfortably within the exception. To begin with, just like with jaywalking, common sense dictates that "government employees routinely—with intent and without it—take stacks of papers before, during, and after meetings." Op.33 (Oldham, J., dissenting). If these activities were to fall within the ambit of the tampering statute, "there should be . . . hundreds if not thousands of arrests during the . . . local-government meetings across [Texas]." *Id.* Yet a decade's worth of review of misdemeanor and felony data from Bexar County shows that

"there has been only one [such arrest]: Sylvia's." *Id*. The rest involved arrests for either misusing financial information or making fake government identification documents, such as driver's licenses, social security numbers, and green cards. ROA.22

As the majority acknowledges, "the evidence [Sylvia] offers is that virtually everyone prosecuted under § 37.10(a)(3) was prosecuted for conduct different from hers." Op.8. But, according to the majority, this evidence falls short, because Sylvia did "not offer evidence of other similarly situated individuals who mishandled a government petition but were not prosecuted under Texas Penal Code § 37.10(a)(3)." Op.7–8. In other words, in the majority's view, Sylvia's evidence—which requires an inference from "an arrest hasn't happened before" to "there are instances where similarly situated individuals not engaged in the same protected activity hadn't been arrested"—isn't evidence sufficient to meet the *Nieves* jaywalking exception. *See* Op.32 n.7 (Oldham, J., dissenting).

Under such a strict reading of the rule, the jaywalking example itself would not pass muster. As Judge Oldham puts it in his dissent, "[i]t's not clear that there will always (or ever) be available comparative

evidence of jaywalkers that weren't arrested. Rather, the retaliatory-arrest-jaywalking plaintiff always (or almost always) must appeal to the commonsense proposition that jaywalking happens all the time, and jaywalking arrests happen virtually never (or never)." Op.27. Because the majority has adopted an impossibly rigid interpretation of the jaywalking exception, in the Fifth Circuit, "the very jaywalking plaintiff invoked by the Supreme Court would lose for lack of nonexistent comparative evidence." *Id.*

But as Judge Oldham argues in dissent and as the Seventh Circuit has squarely held, nothing in *Nieves* imposes this sort of insurmountable evidentiary burden on First Amendment plaintiffs.

Indeed, by rejecting Judge Oldham's argument, the panel majority explicitly split from the Seventh Circuit's decision in *Lund v. City of Rockville*, according to which *Nieves* does not "adopt[] a rigid rule that requires, in all cases, a particular form of comparison-based evidence." Instead, in the Seventh Circuit, courts must "consider each set of facts as it comes" and "assess[] whether the facts supply objective proof of retaliatory treatment." 956 F.3d 938, 945 (7th Cir. 2020). The panel majority recognized that the Seventh Circuit "has taken a broader view

of the *Nieves* exception," but decided not to "adopt this more lax reading." Op.8.

Because Sylvia's retaliatory arrest claim is about a scheme to punish and intimidate a speaker that was planned and developed over a prolonged period of time, it should not fall within *Nieves* in the first place. If it does, however, the jaywalking exception applies. In this matter of first impression, the panel majority should have recognized that, letting Sylvia's case to move forward. The full Court should step in now and ensure the proper application of the Supreme Court precedent.

## CONCLUSION

The petition for rehearing en banc should be granted.

Dated: September 26, 2022.        Respectfully submitted,

/s/ Anya Bidwell
Anya Bidwell (TX Bar No. 24101516)
Patrick Jaicomo
William Aronin
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
abidwell@ij.org
pjaicomo@ij.org
waronin@ij.org

*Counsel for Plaintiff-Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26 day of September, 2022, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

/s/ Anya Bidwell
*Lead Counsel for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

1. This petition complies with the type-volume limits of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,863 words, as determined by the word-count function of Microsoft Word for Microsoft 365, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 in a proportionally spaced typeface, 14-point Century Schoolbook font.

/s/ Anya Bidwell
*Lead Counsel for Plaintiff-Appellee*

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2022

Lyle W. Cayce
Clerk

No. 21-50276

Sylvia Gonzalez,

*Plaintiff—Appellee,*

*versus*

Edward Trevino, II, Mayor of Castle Hills, sued in his individual capacity; John Siemens, Chief of the Castle Hills Police Department, sued in his individual capacity; Alexander Wright, sued in his individual capacity,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-1511

Before Barksdale, Engelhardt, and Oldham, *Circuit Judges.*

Kurt D. Engelhardt, *Circuit Judge*:

In this case, we are confronted with a dilemma that the Supreme Court has wrestled with recently: how are we to treat a plaintiff's claims when she asserts retaliatory arrest for engaging in conduct protected by the First Amendment, but concedes that there exists probable cause for the arrest? As we are bound by the Court's precedent, we hold that Gonzalez fails to establish a violation of her constitutional rights.

No. 21-50276

# I

Sylvia Gonzalez is a resident of Castle Hills, Texas. Castle Hills, a city of fewer than 5000 residents, is governed by a five-member city council that appoints a city manager to handle the day-to-day business of the city. In 2019, Gonzalez was elected to a seat on the city council. During her campaign, Gonzalez learned that many residents of Castle Hills were unhappy with the performance of the contemporary city manager. As her first act in office, Gonzalez participated in organizing a nonbinding petition that called for the removal of the city manager from office. On May 21, Gonzalez attended her first city council meeting as a council member, at which a resident submitted the petition to the council. The council meeting grew contentious and was extended through the next day.

After the meeting ended, Gonzalez left her belongings on the dais and went to speak with a constituent. At one point during this conversation, a police officer approached Gonzalez and informed her that Mayor Edward Trevino wished to speak with her. Gonzalez returned to the dais, and Trevino inquired where the petition was located. Trevino asked Gonzalez to look for the petition in her binder, and, to her alleged surprise, she found the petition there.

Two days later, Castle Hills chief-of-police John Siemens informed Sergeant Paul Turner that Trevino would contact Turner. Trevino wanted to file a criminal complaint alleging that Gonzalez took the petition without consent. Turner began an investigation, which yielded no returns. Siemens then asked special detective Alex Wright to take over the investigation. Wright interviewed two witnesses, including Trevino, and requested an interview of Gonzalez, which she refused. Wright determined that Gonzalez committed a violation of Texas Penal Code §§ 37.10(a)(3) and (c)(1), which provide that "[a] person commits an offense if he . . . intentionally destroys,

conceals, removes, or otherwise impairs the verity, legibility, or availability of a governmental record."

Wright then obtained a warrant against Gonzalez from a magistrate. The process that Wright used was lawful but atypical, as he: (1) chose to secure a warrant, rather than a summons, for a nonviolent crime, and (2) circumvented the district attorney by walking the warrant directly to the magistrate. According to Gonzalez, the use of this process prevented her from using the satellite booking function of the Bexar County jail system, making her unable to avoid spending time in jail when arrested. Wright's affidavit in support of the warrant included statements about the speech in her petition, noting that "[f]rom her very first [council] meeting in May of 2019 [Gonzalez] (along with another alderwoman) has been openly antagonistic to the city manager, Ryan Rapelye, wanting desperately to get him fired." The petition also described, in significant detail, the result of Wright's investigation. Wright narrates a video of the meeting which he characterizes as "clearly show[ing] Defendant Gonzalez intentionally concealing and removing the Petition[] from city custody." According to Wright, the video also shows that Gonzalez was reluctant to return the petition from her binder. And the affidavit speculates on a possible motive for Gonzalez taking the petition: a resident claimed that Gonzalez got her to sign the petition under false pretenses.

Gonzalez alleges that the action against her under Texas Penal Code § 37.10(a)(3) for her conduct is unprecedented. She asserts that "a review of [the] misdemeanor and felony data from Bexar County over the past decade makes it clear that the misdemeanor tampering statute has never been used in Bexar County to criminally charge someone for trying to steal a nonbinding *or* expressive document." She continues, "[o]f 215 grand jury felony indictments obtained under the tampering statute at issue in this case, not one had an allegation even closely resembling the one mounted against

[Gonzalez]." Gonzalez notes that most indictments under the statute involved fake government IDs, such as driver's licenses, and that misdemeanor data is similar.

When Gonzalez learned of the warrant for her arrest, she turned herself in. She was booked on July 18 and spent the evening in jail. She is no longer on the city council, and she alleges that she "will never again help organize a petition or participate in any other public expression of her political speech," nor will she ever "again run for any political office." Gonzalez also asserts that Trevino and others engaged in other activities to attempt to remove her from the council, including having her removed from office based on a "made-up technicality," and filing a civil lawsuit against her alleging incompetence and official misconduct.

Gonzalez sued Trevino, Siemens, Wright, and the City of Castle Hills, asserting two claims under 42 U.S.C. § 1983 for violation of her First and Fourteenth Amendment rights. The Defendants moved to dismiss based on the independent-intermediary doctrine and on qualified immunity grounds. The district court denied Defendants' motion, finding that Gonzalez's claims could proceed notwithstanding the existence of probable case. The individual Defendants appealed.

## II

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Accordingly, under the collateral order doctrine, we have jurisdiction to review this interlocutory appeal of the district court's denial of qualified immunity. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

This court reviews denial of a motion to dismiss based on qualified immunity de novo. *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021). "In doing so, 'we must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmoving party.'" *Id.* (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). The complaint must contain sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). But a complaint's "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice, *see id.* (quotation omitted), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal*, 556 U.S. at 678 (holding that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe*, 691 F.3d at 648.

## III

Gonzalez brings claims under 42 U.S.C. § 1983 against Trevino, Siemens, and Wright on the grounds that she was arrested in retaliation for her protected speech. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Appellants assert a defense of qualified immunity. "There are two aspects to qualified immunity: whether the plaintiff has alleged a violation of a [statutory or] constitutional right and whether the right at issue was 'clearly

No. 21-50276

established' at the time of the alleged violation." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

The question before us is whether Gonzalez has alleged a violation of her constitutional rights when probable cause existed for her allegedly retaliatory arrest. Appellants argue the existence of probable cause dooms Gonzalez's claims. Gonzalez does not dispute that probable cause existed to arrest her but argues that it does not bar her suit.[1]

The Supreme Court addressed the importance of probable cause to retaliatory arrest cases in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). *Nieves* dealt with an allegedly retaliatory arrest at an extreme sporting event in Alaska. *Id.* at 1720. Russell Bartlett quarreled with two police officers and claimed that he was arrested partly for refusing to speak with one of the officers. *Id.* 1720–21. The Court held that the existence of probable cause to arrest Bartlett necessarily defeated his retaliatory arrest claim. *Id.* at 1724. It reiterated the general rule it announced in *Hartman v. Moore*, 547 U.S. 250 (2006), that in retaliatory prosecution cases a plaintiff must plead and prove the absence of probable cause for the underlying criminal charge. *Id.* It then held that rule applied to retaliatory arrest claims both because "[o]fficers frequently must make 'split-second judgments' when deciding whether to arrest, and the content and manner of a suspect's speech may convey vital information," and because "evidence of the presence or absence of probable

---

[1] Appellants frame their arguments in terms of our independent-intermediary doctrine, which dictates that "if an independent intermediary, such as a justice of the peace, authorizes an arrest, then the initiating party cannot be liable for false arrest." *Shaw v. Villanueva*, 918 F.3d 414, 417 (5th Cir. 2019). Because Gonzalez does not contest the existence of probable cause, this case may be resolved without resorting to this doctrine. *See Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 553 (5th Cir. 2016) (holding that the independent-intermediary doctrine only "becomes relevant when . . . a plaintiff's claims depend on a lack of probable cause to arrest him"). The finding of the independent magistrate further demonstrates that probable cause existed for Gonzalez's arrest here.

cause for the arrest will be available in virtually every retaliatory arrest case." *Id.* at 1724 (citations omitted).

However, the Supreme Court carved out a narrow exception to the general rule that the existence of probable cause will defeat a retaliatory arrest claim. Under this exception, plaintiff need not plead lack of probable cause "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. This is because "[i]n such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953–54) (2018)). The Court provided the example of jaywalking, which it noted "is endemic but rarely results in arrest." *Id.* It continued, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking," the claim should not be dismissed despite the existence of probable cause because "[i]n such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury." *Id.* The Court "conclude[d] that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* All parties agree that *Nieves* governs this case; they differ, however, on whether this "case squeezes through the crack of an opening that *Nieves* left ajar." *Lund v. City of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020).

Gonzalez cannot take advantage of the *Nieves* exception because she has failed to "present[] objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 139 S. Ct. at 1727. Gonzalez does not offer evidence of other similarly situated individuals who mishandled a

No. 21-50276

government petition but were not prosecuted under Texas Penal Code
§ 37.10(a)(3). Rather, the evidence she offers is that virtually everyone
prosecuted under § 37.10(a)(3) was prosecuted for conduct different from
hers. The inference she asks us to draw is that because no one else has been
prosecuted for similar conduct, her arrest must have been motivated by her
speech. But the plain language of *Nieves* requires comparative evidence,
because it required "objective evidence" of "otherwise similarly situated
individuals" who engaged in the "same" criminal conduct but were not
arrested. *Id.* The evidence Gonzalez provides here comes up short.

We recognize that one of our sister circuits has taken a broader view
of the *Nieves* exception and held that "the [*Nieves*] majority does not appear
to be adopting a rigid rule that requires, in all cases, a particular form of
comparison-based evidence." *Lund*, 956 F.3d at 945. The Seventh Circuit
came to this conclusion primarily in reliance on Justice Gorsuch's
concurrence in part and Justice Sotomayor's dissent in *Nieves*. *Id.* at 944–45.
We do not adopt this more lax reading of the exception. Instead, the best
reading of the majority's opinion compels the opposite approach. The
Court's language was careful and explicit: it required "objective evidence"
of "otherwise similarly situated individuals" who engaged in the same
criminal conduct but were not arrested. *Nieves*, 139 S. Ct. at 1727. The most
reasonable reading of this language is that some comparative evidence is
required to invoke this "narrow" exception. *Id.* And importantly, the
majority had the benefit of Justice Gorsuch's concurrence in part and dissent
in part as well as and Justice Sotomayor's dissent when crafting the
exception. Had the majority wished to soften or broaden the language of the
exception in response to those criticisms, it could have done so. Indeed, the
driving reason for Justice Sotomayor's dissent seems to be that she read the
majority opinion the same way we do: as requiring that a plaintiff produce
some comparative-based evidence. *See id.* at 1739 (Sotomayor, J.,

No. 21-50276

dissenting).[2]

In sum, the plain language of the *Nieves* exception requires evidence that Gonzalez has not provided. Lacking such evidence, *Nieves* tells us that Gonzalez's claims fail because probable cause existed to arrest her.

Gonzalez also relies on another Supreme Court case to argue that her claim may proceed notwithstanding probable cause. In *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), the Supreme Court dealt with a case involving Fane Lozman, a citizen of Riviera Beach. Like Gonzalez, Lozman was an outspoken critic of local city officials. According to Lozman, the city council hatched a plan to intimidate him in order to curtail his speech. *Id.* at 1949. At a public meeting before the council, Lozman started making remarks, and refused to leave the podium when asked. He was arrested for violating the city counsel's rules of procedure. *Id.* at 1949–50. He alleged that the arrest was in retaliation for his speech but conceded that probable cause existed to arrest him. Lozman sued the City of Rivera Beach, asserting a claim under *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658 (1978). *Id.* at 1950–51. The jury found for the City, and on appeal the Eleventh Circuit affirmed, holding that the existence of probable cause for the arrest necessarily defeated Lozman's claims. *Id.* at 1950. The Supreme Court reversed, holding that Lozman's claim could proceed.

Gonzalez's argument is that *Lozman* is applicable here because, as in that case, her "claim is far afield from the typical retaliatory arrest claim"

---

[2] The dissent offers a thoughtful but different reading of *Nieves*. But the dissent's reading invokes the same concerns expressed in Justice Sotomayor's dissent and Justice Gorsuch's separate opinion. The dissent also contends that *Nieves* may not be applicable here because this case did not involve a split-second decision by a police officer. Putting aside that the district court and the parties emphasized the relevance of *Nieves*, nothing in that case cabins its holding to actions of officers in the line of duty.

No. 21-50276

because she was not arrested by an officer making a "split-second" decision and because there is additional evidence of retaliatory intent, including certain statements in the affidavit. *Id.* at 1954. But the Supreme Court allowed Lozman's claims to proceed not because of the unusual facts of the case, but because he was asserting a *Monell* claim against the municipality itself, rather than individuals. It held that "[t]he fact that Lozman must prove the existence and enforcement of an official policy motivated by retaliation separates Lozman's claim from the typical retaliatory arrest claim." *Id.* This was so because "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Id.* Moreover, "[a]n official policy can be difficult to dislodge." *Id.*

*Lozman*'s holding was clearly limited to *Monell* claims.[3] Our sister circuits have recognized as much. *See Novak v. City of Parma*, 932 F.3d 421, 429–30 (6th Cir. 2019) (holding that "*Lozman* does not apply where, as here, the plaintiff sues individual officers"); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1294 (11th Cir. 2019) (noting that *Lozman* applies only to cases involving official policies). Gonzalez did bring a *Monell* claim against the City of Castle of Hills, but that claim is irrelevant to this appeal.

Finally, in her Rule 28(j) materials, Gonzalez asserts that a recent case from this circuit, *Villarreal v. City of Laredo*, 17 F.4th 532 (5th Cir. 2021), holds that a claim under § 1983 may proceed on similar facts. In *Villarreal*, the plaintiff was a citizen-reporter who was arrested for violating a Texas statute that prohibited citizens from soliciting governmental information from public officials that had not yet been made public. We reasonably pointed out that "it should be obvious to any reasonable police officer that

---

[3] The dissent acknowledges as much. *See post* at 30–31.

No. 21-50276

locking up a journalist for asking a question violates the First Amendment" and therefore qualified immunity did not bar the plaintiff's suit. *Id.* at 541. The panel also recognized that its opinion called the constitutionality of the Texas statute into question. *Id.* at 546–47.

*Villarreal* was different in kind and did not address the issue we face here. In *Villarreal*, the conduct the plaintiff was arrested for—asking questions of police officers—was plainly constitutional. Here, the conduct Gonzalez was arrested for—allegedly stealing a government document—is not plainly constitutional. The heart of our holding in *Villarreal* is that a citizen cannot be arrested under a statute that outlaws plainly constitutional behavior, an issue not raised on these facts. Indeed, *Villarreal* did not address—nor did it even cite—*Nieves* or *Lozman*, the cases both parties recognize govern this case. We therefore find that our opinion in *Villarreal* does not control here.

In his dissent, Judge Oldham makes a forceful case for why the Constitution ought to provide a claim here, particularly given that Gonzalez's arrest was allegedly in response to her exercise of her right to petition. Were we writing on a blank slate, we may well agree with our distinguished colleague. But we remain bound by what we consider the better readings of the relevant Supreme Court precedent.

## IV

For the reasons stated herein, we REVERSE the district court's order denying Appellants' motion to dismiss, and REMAND with instructions that Gonzalez's claims against Appellants be dismissed.

No. 21-50276

Andrew S. Oldham, *Circuit Judge*, dissenting:

This case involves an alleged conspiracy of city officials to punish Sylvia Gonzalez—a 72-year-old councilwoman—for spearheading a nonbinding petition criticizing the city manager. The district court concluded that Sylvia's claim survives qualified immunity at the motion-to-dismiss phase. My esteemed colleagues don't reach the clearly-established-law question because they conclude that under the best reading of Supreme Court precedent, Sylvia failed to adequately state a claim. With the deepest respect and admiration for my learned and distinguished friends in the majority, I disagree.

I.

A.

We are reviewing a motion-to-dismiss decision, so we must take the facts as Sylvia Gonzalez plausibly alleges them, drawing every reasonable inference in her favor. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). At this stage, here's what we must accept as true:

Castle Hills is a city in Texas with fewer than 5,000 residents. It's governed by a city council of one mayor and five aldermen (called "councilmembers"). The mayor and the councilmembers are elected positions. The council appoints a city manager for an indefinite period to handle the City's day-to-day decisionmaking. The city manager nominates the chief of police and needs approval from the city council.

In Spring 2019, Sylvia Gonzalez was a retired 72-year-old woman living in Castle Hills. Because she wanted to give back to her community, Sylvia ran for a seat on the council. She faced an incumbent. And she won.

During her campaign, Sylvia repeatedly heard complaints about the city manager. After her successful election, Sylvia sought to express her

No. 21-50276

constituents' discontent to the entire city council. So she spearheaded a nonbinding citizens' petition urging the removal of the city manager Ryan Rapelye. The petition complained that for years, "various city managers [have] talked about [fixing] street[s]" but "[n]one have fixed a single" one. To "restor[e] effective management," the petition proposed that Rapelye be replaced with a former city manager who had followed through on promises. Hundreds of Castle Hills residents signed the petition.

At Sylvia's first council meeting, on May 21, 2019, a resident submitted the petition to the council, specifically to Mayor Edward Trevino. The meeting was contentious, to put it mildly. In fact, the petition spurred so much discussion that it led to another council meeting the next day. Given the apparent significance of the petition, one would think that between this meeting and the one the following day, Trevino would've made copies of the document. But he did not.

The next day did not go more smoothly. The city council continued to debate Rapelye's job performance. When the meeting finally finished, Sylvia got ready to leave, picked up her documents, and placed them in her binder. Before she left, a constituent asked Sylvia some questions. During their conversation, a police officer in charge of safety at the meeting (Captain Steve Zuniga) interrupted and told Sylvia that Trevino wanted to talk to her.

Sylvia went to Trevino who was still at his seat next to Sylvia's. Trevino asked Sylvia, "Where's the petition?" Sylvia responded, "Don't you have it? It was turned in to you yesterday." Trevino said that he didn't and then asked Sylvia to check her materials for it. And to Sylvia's surprise, the petition was in her binder. So she handed Trevino the petition, who said that she "probably picked it up by mistake." After all, they sat right next to each other at the meeting. You might think that was the end of the matter.

No. 21-50276

But you'd be wrong. Soon after, Trevino hatched a plan with other city officials to retaliate against Sylvia for spearheading the petition. Before describing the plan, I'll introduce you to the schemers: Mayor Trevino, Police Chief John Siemens, and "Special Detective" Alex Wright.[1] Trevino appointed Rapelye as city manager, Rapelye appointed Siemens as police chief, and Siemens commissioned his trusted friend Wright as a "special detective." Together, I call them "the Conspirators."

The Conspirators' plan had three parts: (1) investigate Sylvia for purporting to intentionally conceal the very petition she championed; (2) drum up charges against Sylvia and arrest her in a way that makes sure she spends the night in jail; and (3) remove her from office. Part three follows from part two because "if a councilmember is convicted of a felony or a misdemeanor involving official misconduct, it would operate as an immediate removal from office."

Start with the investigation. On May 24, Siemens—who again was appointed by City Manager Rapelye—told another police officer (Sergeant Paul Turner) that Trevino would be contacting him "in reference to the filing of a criminal complaint" against Sylvia. What crime did she conceivably commit? The Conspirators' theory was that Sylvia "concealed" a government document by picking up her own petition at the end of the second council meeting and then immediately handing it back to Trevino. Trevino asked Sergeant Turner to investigate this purported "crime." Turner started his investigation and (unsurprisingly) got nowhere.

But this did not stop Trevino and Siemens. On June 18, 2019, Siemens deputized Wright to take over Turner's investigation. Wright is a trusted

---

[1] The scheme is even more elaborate than that set out here. But because all the claims aren't before us on appeal, I omit these other troubling allegations.

No. 21-50276

friend of Siemens and a private attorney; he's not a peace officer. Wright then spent another month investigating Sylvia. During the investigation, Wright interviewed Trevino, Captain Zuniga, and Rapelye.

On June 24, 2019, "Special Detective" Wright interviewed Trevino. According to Wright, Trevino stressed that Sylvia was "openly antagonistic to the city manager" and "desperately [wanted] to get him fired." Wright also interviewed Captain Zuniga. According to Wright, Zuniga provided facts that Wright "found to be consistent with Mayor Trevino's." One fact was that Sylvia stated that she thought the petition in her possession were "extras" because they were "copies." But recall that even though Trevino now thought that the petition was significant, he never had copies made between the first and second meeting.

"Special Detective" Wright then filed an arrest affidavit asserting that Sylvia committed a Class A misdemeanor for "intentionally destroy[ing], conceal[ing], remov[ing], or otherwise impair[ing] the verity, legibility, or availability of a governmental record." Tex. Penal Code § 37.10(a)(3). Never mind that Sylvia would have no reason to conceal her own petition. Never mind that Sylvia did not in fact conceal her own petition. And never mind that Sergeant Turner, an actual officer, investigated this purported "crime" for over a month and (obviously) got nowhere.

The plan then entered its next phase: the arrest. "Special Detective" Wright lived up to his title. He did three special things to ensure that Sylvia would be arrested and jailed rather than simply asked to appear before a judge.

First, Wright chose to get a warrant rather than a summons. Summonses are normally reserved for people suspected of nonviolent crimes, and they don't require a trip to jail. Obviously, Sylvia's purported

No. 21-50276

"crime" was nonviolent. Still, Wright chose to get a bench warrant for her arrest.

Second, Wright didn't get a warrant through the district attorney ("DA")—even though that's the normal procedure. Instead, Wright circumvented the DA. By using a procedure typically reserved for violent felonies or emergency situations, Wright walked the warrant directly to a magistrate judge. This side-step ensured that the DA couldn't stop the retaliatory arrest. And there can be little doubt that the DA would've stopped it if given the chance: After all, when the DA's office finally learned of the charges and reviewed them, it immediately dismissed them.

Third, by using the procedure that skirted the DA, Wright ensured that Sylvia couldn't avoid jail through the satellite-booking function. This function allows individuals with outstanding warrants for nonviolent offenses to be booked, processed, and released without being jailed. But because Sylvia's warrant wasn't obtained through the traditional channels, it wasn't discoverable through the satellite office's computer system. This left Sylvia with only one option: jail.

So off to jail she went. When Sylvia learned of the arrest warrant, she decided to turn herself in. On July 18, 2019, Sylvia—a 72-year-old councilwoman—was booked. She spent a day in jail—handcuffed, on a cold metal bench, wearing an orange jail shirt, and avoiding using the restroom, which had no doors and no toilet-paper holders. The entire time she wasn't allowed to stand up and stretch her legs.

The next part of the plan was removing her from office. This time the Conspirators only somewhat succeeded. It's true that the DA dismissed the charges, so Sylvia wasn't "convicted" of the misdemeanor, and in turn, she wasn't "immediately remov[ed] from office." But it's also true that Sylvia is "so traumatized by the experience that she will never again help organize a

petition or participate in any other public expression of her political speech [and] will . . . never again run for any political office." Although the plan didn't go as intended, the Conspirators ended up succeeding in a more underhanded and permanent way.

## B.

Sylvia sued the Conspirators in their individual capacities and the City of Castle Hills under 42 U.S.C. § 1983 for violating her First Amendment right as incorporated by the Fourteenth Amendment. The Conspirators moved to dismiss Sylvia's claim based on qualified immunity, while the City moved to dismiss her claim because she didn't sufficiently allege a claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

The district court denied both motions to dismiss. Only the denial of the Conspirators' motion is relevant here on interlocutory appeal. The court first rejected the Conspirators' principal argument that Sylvia had to prove the absence of probable cause to plead a First Amendment retaliatory-arrest claim. The court did so because under clearly established law, Sylvia alleged "the existence of objective evidence that she was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Because the Conspirators didn't meaningfully contest whether Sylvia plausibly alleged a violation of her First Amendment rights, the court concluded that Sylvia's claim passed motion-to-dismiss muster.

The Conspirators timely appealed. We have jurisdiction under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Review is *de novo. Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

No. 21-50276

II.

Qualified immunity includes two inquiries. The first question is whether the officials violated a constitutional right. *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021). I say yes. The second question is whether the right at issue was clearly established at the time of the alleged misconduct. *Ibid.* On this question, I am not so sure. But my esteemed colleagues in the majority do not address it, so I do not offer a reason to disturb the district court's judgment.

A.

To allege a First Amendment retaliation claim, Sylvia must show that: (1) she engaged in a constitutionally protected activity, (2) the officials took a material adverse action that caused her to suffer an injury, and (3) there's a causal connection between the officials' retaliatory animus and her subsequent injury. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *see also Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (Thapar, J.). I address each in turn. I then (4) address (a) the Conspirators' remaining counterarguments and (b) my esteemed colleagues' approach.

1.

Sylvia engaged in activity that was protected by the First Amendment as incorporated by the Fourteenth Amendment. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I; *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 n.4 (1967) (incorporating the relevant clauses). As the Conspirators' counsel rightly admitted at oral argument, Sylvia alleged a violation of her right to petition the government.

No. 21-50276

The right to petition has a rich historical pedigree that "long antedate[s] the Constitution." *McDonald v. Smith*, 472 U.S. 479, 482 (1985); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395 (2011) (The right "is of ancient significance in the English law and the Anglo–American legal tradition."). In fact, its roots "run[] from [the] Magna Carta in 1215 through royal commitments in the Petition of Right of 1628 and the Bill of Right of 1689 to seventeenth- and eighteenth-century parliamentary guarantees of a general right to petition." Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 Nw. U. L. Rev. 739, 741 (1999) (quotation omitted).

In 1215, the Magna Carta "confirmed the right of barons to petition the King." *Borough of Duryea*, 564 U.S. at 395. In 1689, the English Declaration of Rights provided that "[i]t is the Right of the Subjects to petition the King, and all Commitments and Prosecutions for such Petitioning are Illegal." 1 Wm. & Mary, ch. 2, 6 Statutes of the Realm 143; *see also McDonald*, 472 U.S. at 482; *Borough of Duryea*, 564 U.S. at 395–96; 1 William Blackstone, Commentaries *139 ("[A]ll commitments and prosecutions for such petitioning [were] illegal.").

Early American Colonies also provided a right to petition. *See Borough of Duryea*, 564 U.S. at 394; Lawson & Seidman, *supra*, at 748–50; Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 Yale L.J. 142, 144–55 (1986). For example, the Stamp Act Congress of 1765 "included a right to petition the King and Parliament in its Declaration of Rights and Grievances." *McDonald*, 472 U.S. at 482. And the "first Continental Congress in 1774 recognized the right to petition." Lawson & Seidman, *supra*, at 750. The "Declarations of Rights enacted by many state conventions" also had "a right to petition for redress of grievances." *McDonald*, 472 U.S. at 482–83. And during the ratification debates, Anti-Federalists "circulated petitions urging delegates not to adopt the Constitution absent modification by a bill of rights." *Borough of Duryea*,

No. 21-50276

564 U.S. at 396.[2] The significance of petitioning continued after the ratification of the Constitution and the First Amendment. *See id.* at 396–97.

Given this tradition, it's unsurprising that the Supreme Court has put the right on a pedestal. The Court has stressed that the right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quotation omitted). It has also said that the right is "an essential safeguard of freedom." *Borough of Duryea*, 564 U.S. at 395. It even went so far to say that "[t]he very idea of a government, republican in form, implies a right . . . to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).[3] And for good reason: "The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to

---

[2] The Anti-Federalists pointed, in particular, to the Constitution's omission of a right to petition. *See, e.g.*, Centinel No. 2, *in* 2 The Complete Anti-Federalist 143, 153 (Herbert J. Storing ed., 1981) (arguing that "petitioning or remonstrating to the federal legislature ought not to be prevented"); Centinel No. 4, *in* 2 The Complete Anti-Federalist, *supra*, at 164 ("Of what avail will be a prosperous state of commerce, when the produce of it will be at the absolute disposal of an arbitrary and unchecked government, who may levy at pleasure the most oppressive taxes; who may destroy every principle of freedom; who may even destroy the privilege of complaining."); Philadelphiensis No. 5, *in* 3 The Complete Anti-Federalist, *supra*, at 116–18; Essay by Samuel, *in* 4 The Complete Anti-Federalist, *supra*, at 193 (objecting that there is no "provision made for the people or States, to petition or remonstrate"). In 1788, the American people ratified the Constitution without an express protection for the right to petition; but soon thereafter, they "recognized the power of the Anti-Federalists' criticisms and ratified the [First] Amendment in 1791." *United States v. ERR, LLC*, 35 F.4th 405, 410 (5th Cir. 2022).

[3] *See also* Lawson & Seidman, *supra*, at 742 ("The constitutional guarantee of the right to petition is a guarantee against legislative interference with a preexisting, predefined right whose contours are assumed rather than created by the Constitution."); *Borough of Duryea*, 564 U.S. at 403 (Scalia, J., concurring in the judgment in part and dissenting in part) ("The reference to 'the right of the people' indicates that the Petition Clause was intended to codify a pre-existing individual right, which means that we must look to historical practice to determine its scope.").

request recognition of new rights and to assert existing rights against the sovereign." *Borough of Duryea*, 564 U.S. at 397.[4]

It's thus safe to say that Sylvia engaged in speech and conduct "high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1955 (2018).

2.

The Conspirators took a material adverse action against Sylvia. Retaliation by government officials for exercising one's right to petition violates the First Amendment. *See Nieves*, 139 S. Ct. at 1722 ("As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." (quotation omitted)); *Hous. Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) ("[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." (quotation omitted)).

The adverse action here is "easy to identify": It's the "arrest." *Id.* at 1260. And that action is a "material" violation of Sylvia's rights. *Id.* at 1261. Although "we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers," we don't expect them to shoulder an arrest and a night in jail for a

---

[4] The right to petition also gave rise to the celebrated *Case of the Seven Bishops*, 12 How. St. Tr. 183 (K.B. 1688), where the jury famously acquitted bishops charged with libel for petitioning the government. This led to the Constitution's Take Care Clause, which "ruled out the [executive's] suspending and dispensing powers." *See Texas v. Biden*, 20 F.4th 928, 979–82 (5th Cir. 2021); *see also* Michael W. McConnell, The President Who Would Not Be King: Executive Power Under the Constitution 115–19 (2020).

No. 21-50276

misdemeanor as retaliation for exercising their First Amendment right to petition. *Ibid.*

3.

Next, the causal connection. Sylvia alleged numerous facts to show that the Conspirators arrested her for petitioning the government. This is not a case where we must guess about the Conspirators' motives. It's also not a case where we must rely on the allegations in the complaint standing alone. Rather, *the face of the arrest affidavit itself* lists Sylvia's viewpoints as relevant facts warranting her arrest. For example:

- "From her very first [council] meeting in May of 2019, [Sylvia] has been openly antagonistic to the city manager, Ryan Rapelye, wanting desperately to get him fired."
- "Part of her plan to oust Mr. Rapelye involved collecting signatures on several petitions to that effect."
- "Gonzalez had personally gone to [a resident's] house on May 13, 2019, to get her signature on one of the petitions under false pretenses, by misleading her, and by telling her several fabrications regarding Ryan Rapelye . . . ."

There is no way to understand "Special Detective" Wright's affidavit except that he—as a private attorney deputized to act by his fellow Conspirators—wanted to arrest Sylvia because of her petition.

If there were any doubt on that score, "Special Detective" Wright eliminated it with the highly irregular procedure he used to get Sylvia's warrant. *See supra*, at 15–16. This procedure ensured that the DA couldn't stop the arrest and that Sylvia spent the night in jail for a nonviolent misdemeanor rather than merely appearing before a judge at a particular date

and time. And the moment the actual prosecutors found out about the shenanigans, they dismissed the case.

Thus, the Conspirators' animus plainly caused Sylvia's arrest. Sylvia has met her burden of showing the requisite causal connection.

4.

Now, the Conspirators' and my esteemed colleagues' objections. I first (a) reject the Conspirators' contention that Sylvia relies on vicarious liability to establish her claim. I then (b) address my colleagues' conclusion that the presence of probable cause dooms Sylvia's claim.

a.

The Conspirators complain that the district court didn't consider each of them separately. That is, they think the court allowed Sylvia to rely on vicarious liability to establish her claim. They're wrong.

It's true that Sylvia "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). But she did just that: She sufficiently connected each defendant to her claim through her allegations of a conspiracy.

A "conspiracy allegation offers 'the conceptual spring' for holding [one] defendant liable for the actions of another defendant." *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020) (quoting *Farrar v. Cain*, 756 F.2d 1148, 1151 (5th Cir. 1985)). "A plaintiff must prove that a single plan existed, that each alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy." *Id.* at 517 (quotation omitted). "An express agreement need not exist, and each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Ibid.* (quotation omitted).

No. 21-50276

Sylvia sufficiently alleged a conspiracy between Trevino, Siemens, and Wright. First, Sylvia adequately alleged that there was one plan: retaliate against Sylvia for exercising her right to petition with the goal of removing her from the city council.

Second, Sylvia adequately alleged that each coconspirator shared in the general conspiratorial objective. Mayor Trevino nominated Rapelye to be city manager. Siemens was appointed to his position as the chief of police by Rapelye. Siemens hired his trusted friend Wright as a "special detective" to take over the investigation from Sergeant Turner, even though Siemens's own sergeant had no success in his investigation. Trevino's interview with Wright made clear that it was Sylvia's petition efforts that motivated his filing of the complaint. And Wright's inclusion of these seemingly irrelevant facts in the warrant affidavit underscores that Wright shared in the conspiratorial objective to retaliate against Sylvia for spearheading the petition.

Last, Sylvia adequately alleged that one of the Conspirators took an overt act in furtherance of the general conspiratorial objective. Obviously, at least Wright took an affirmative act when he secured an arrest warrant and ensured that Sylvia spent the night in jail. But Trevino and Siemens did too. Trevino took an overt act because he filed the criminal complaint that started it all and participated in his coconspirator's investigation by giving an interview. And Siemens deputized Wright in the first place.

In short, Sylvia sufficiently connected each individual defendant to this claim through her conspiracy allegations.

b.

Next, my esteemed colleagues don't dispute that Sylvia engaged in protective activity, that the Conspirators took a material adverse action, or that retaliatory animus caused the arrest. Instead, they conclude that because

the parties agree that there was probable cause for the arrest, Sylvia's claim fails under the Supreme Court's decision in *Nieves*.

With deepest respect, I am obligated to disagree. I first (i) explain *Nieves*. I then (ii) explain the more relevant precedent, *Lozman*. I last (iii) explain that under *Nieves* or *Lozman* or both, Sylvia has met her burden.

i.

It's well-established that "the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (quotation omitted); *see also Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021). Instead, we must read precedent, including *Nieves*, "fairly and holistically." *Mitchell Law Firm, LP v. Bessie Jeanne Worthy Revocable Tr.*, 8 F.4th 417, 421 (5th Cir. 2021); *see also United States v. Vargas-Soto*, 35 F.4th 979, 991 (5th Cir. 2022) (explaining that "it's never a fair reading of precedent to take . . . sentences out of context").

In *Nieves,* the Supreme Court announced a two-part rule. The first part is a general rule: "The presence of probable cause should *generally* defeat a First Amendment retaliatory arrest claim." 139 S. Ct. at 1726 (emphasis added). The second part is a "narrow qualification": Probable cause will *not* defeat a retaliatory-arrest claim in "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. To avail herself of the second part of this rule, the plaintiff can "present[] objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Ibid.* This is an "objective inquiry." *Ibid.*

My learned colleagues hold that the "most reasonable reading of this language is that some comparative evidence is required to invoke" the second part of *Nieves*'s rule. *Ante*, at 8. That is, my colleagues hold that probable

cause will defeat a retaliatory-arrest claim (*Nieves* part one) unless the retaliatory-arrest plaintiff can produce *comparative* evidence showing that officers generally do not arrest people for the underlying crime (*Nieves* part two).

In my view, and again with deepest respect, such *comparative* evidence is not required. *Nieves* simply requires objective evidence. And evidence is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019). So the retaliatory-arrest plaintiff need only provide (objective) evidence that *supports* the required proposition by tending to connect the officers' animus to the plaintiff's arrest. Such evidence could be comparative. But as far as I can tell, nothing in *Nieves* requires it to be so.

Context confirms that straightforward reading. The second part of the *Nieves* rule identifies circumstances "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 139 S. Ct. at 1727. In those circumstances, "probable cause does little to prove or disprove the causal connection between animus and injury." *Ibid.* The *Nieves* majority gave a prototypical example of a circumstance that should meet the second part: jaywalking. As the Court explained:

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury . . . .

No. 21-50276

*Ibid.* It's not clear that there will always (or ever) be available comparative evidence of jaywalkers that weren't arrested. Rather, the retaliatory-arrest-jaywalking plaintiff always (or almost always) must appeal to the commonsense proposition that jaywalking happens all the time, and jaywalking arrests happen virtually never (or never). Yet under today's opinion, I am afraid the very jaywalking plaintiff invoked by the Supreme Court to illustrate part two of the *Nieves* rule would lose for lack of nonexistent comparative evidence.

I'm also not sure what to make of the separate writings in *Nieves*. *Contra ante*, at 8–9. The *Nieves* Court gave us five different opinions to explain its holding. It's true that Justice Sotomayor (writing only for herself) said the *Nieves* majority "arbitrarily fetishizes one specific type of motive evidence—treatment of comparators—at the expense of other modes of proof." 139 S. Ct. at 1739 (dissenting op.). But Justice Gorsuch (also writing only for himself) concurred by emphasizing that "I do not understand the majority as going that far." *Id.* at 1734 (concurring op.). And the *Nieves* majority said nary a word about either assertion. Nor did any of this actually matter in *Nieves* because the case did not implicate comparative evidence in any event. So I think the absolute most that can be said about the Court's holding is that (1) the presence of probable cause is not a bar to retaliatory-arrest claims, so long as (2) the plaintiff produces objective evidence of retaliatory animus.

But the more fundamental problem is that it's not even clear to me *Nieves* is the most relevant precedent here. Recall that *Nieves* creates a two-part rule: a general rule that probable cause defeats retaliatory-arrest claims (part one), and an exception for circumstances where officers generally exercise discretion not to arrest (part two). The *Nieves* Court framed the *entirety* of that two-part rule to accommodate the necessities of split-second decisions to arrest. *See id.* at 1724 (pointing to the need for "split-second

judgments" (quotation omitted)); *see also id.* at 1725 ("Police officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in circumstances that are tense, uncertain, and rapidly evolving." (quotation omitted)). And *Nieves* itself involved precisely such a split-second warrantless arrest. *See id.* at 1720–21 (describing the incident, which involved a drunk and combative partygoer who did not immediately comply with police orders and almost got tased). It's unclear to me why we should apply a rule designed for split-second warrantless arrests to a deliberative, premediated, weeks-long conspiracy.[5]

In short, *Nieves* designed a rule to reflect "the fact that protected speech [or conduct] is often a legitimate consideration when deciding whether to make an arrest" and the fact that "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." *Id.* at 1724. In this case, it's plainly impossible that Sylvia's speech and petitioning activity was a "legitimate consideration" in the Conspirators' efforts to jail her. And there's zero difficulty or complexity in figuring out whether it was animus or her purportedly criminal conduct that caused her arrest. It was plainly the former; if it were even conceivably the latter, the Conspirators would not have needed a faux detective, would not have needed to circumvent the DA's office, and would not have had their charges dismissed the moment a real law-enforcement official found out about them. It's therefore unclear to me what purchase *Nieves* has here.

---

[5] It's true that *Nieves* expressly framed only the first part of its rule—that probable cause generally defeats retaliatory-arrest claims—to accommodate split-second decisions. But it's also irrelevant. That's because if the general rule does not apply to deliberative, intentional, and premediated conspiracies to punish people for protected First Amendment activity, then surely the exception to that general rule (*Nieves* part two) also does not apply to such deliberative, intentional, and premediated conspiracies.

ii.

Rather, the more relevant rule appears to come from *Lozman*. That case involved materially identical facts to ours. There, Fane Lozman was "an outspoken critic" of the City of Riviera Beach, who "often spoke during the public-comment period at city council meetings," "criticized" public officials, and even sued the City. 138 S. Ct. at 1949. During "a closed-door session," the City's council "formed an official plan to intimidate him" and executed the plan at the next public meeting. During the public-comment period, Lozman "stepped up to the podium to give remarks," but early into his remarks, a councilmember "interrupted Lozman" and "direct[ed] him to stop" talking. *Ibid.* Lozman, however, continued, so the councilmember "called for the assistance of the police officer in attendance." *Ibid.* After Lozman refused to leave the podium, the councilmember ordered the officer to arrest him. *Id.* at 1949–50. And the officer did. *Id.* at 1950.

Lozman sued the City under § 1983 for violating his First Amendment rights. Although Lozman "concede[d] that there was probable cause for the arrest," the Supreme Court concluded that the existence of probable cause itself didn't doom his claim. *Id.* at 1951. In reaching that conclusion, the Court highlighted four characteristics. First, the Court noted that Lozman didn't "sue the officer who made the arrest." *Id.* at 1954. Second, the Court highlighted that Lozman alleged "more governmental action than simply an arrest" because there was "a premeditated plan to intimate him." *Ibid.* This mattered because an "official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Ibid.* Third, the Court emphasized that the "retaliation [was] for prior, protected speech bearing little relation to the criminal offense for which the arrest is made." *Ibid.* Finally, the Court stressed that the retaliation was for Lozman exercising his right to petition, which is "high in the hierarchy of First

No. 21-50276

Amendment values." *Id.* at 1954–55. Because of these four characteristics, the Court determined that "Lozman's claim [wa]s far afield from the typical retaliatory arrest claim" and "the [causation] difficulties that might arise [in] the mine run of arrests made by police officers" weren't present. *Id.* at 1954.

Each of those characteristics is present (at least in part) here. First, Sylvia didn't sue an officer who made the arrest. To be sure, Wright obtained the arrest warrant. But he didn't find Sylvia and arrest her; that is, he didn't actually execute the warrant. Rather, another official executed the warrant when Sylvia turned herself in. And Sylvia didn't sue that official. Second, the Conspirators "formed a premeditated plan" to retaliate against Sylvia for engaging in protected activity. *Ibid.* Third, the protected activity wasn't a legitimate consideration for the arrest. Indeed, the arrest bore "little [relevant] relation to the criminal offense for which the arrest is made." *Ibid.*; *cf. Nieves*, 139 S. Ct. at 1723–24 ("The causal inquiry is complex because protected speech is often a *wholly legitimate consideration* for officers when deciding whether to make an arrest." (emphasis added) (quotation omitted)). Sylvia's spearheading of the petition was irrelevant to the elements of the criminal offense and the reasons provided in the affidavit to get the arrest warrant. In fact, her involvement cut directly against it. After all, why would Sylvia intentionally conceal the very petition she championed? Last, the right violated here is also the right to petition. *See Lozman*, 138 S. Ct. at 1954–55.

In the end, the only relevant difference between *Lozman* and this case is that Sylvia's claim is against *the Conspirators*, while Lozman brought a *Monell* claim against *the City itself*. My esteemed colleagues find this difference dispositive. *See ante*, at 10 ("*Lozman*'s holding was clearly limited

to *Monell* claims.").[6] It's true that *Lozman* involves a *Monell* claim and that *Nieves* wrote that the *Lozman* Court "limited [its] holding to arrests that result from official policies of retaliation." 139 S. Ct. at 1722. But as the *Nieves* Court acknowledged, the *Monell* claim mattered because it showed that *Lozman* involved "facts [that] were far afield from the typical retaliatory arrest claim," while *Nieves* involved a "more representative case." *Ibid.* (quotation omitted). So even though *Lozman*'s holding is limited, the opinion's teachings are still instructive—especially when understanding *Nieves*.

iii.

Under *Nieves* or *Lozman* or both, Sylvia has met her burden. She alleges that "a review of the misdemeanor and felony data from Bexar County over the past decade makes it clear that the misdemeanor tampering statute has never been used in Bexar County to criminally charge someone for trying to steal a nonbinding or expressive document." More specifically, she alleges that most indictments under the statute involved fake government IDs, such as driver's licenses, social security numbers, and green cards. As my esteemed colleagues recognize, "the evidence [Sylvia] offers is that virtually everyone prosecuted under [the Texas statute] was prosecuted for conduct different from hers." *Ante*, at 8. In these circumstances, that is enough to satisfy the second part of the *Nieves* rule and to hold that probable cause does nothing to defeat Sylvia's retaliatory-arrest claim.

First, Sylvia's evidence is obviously objective. She did a comprehensive "review of misdemeanor and felony data from Bexar County

---

[6] They also cite two of our sister circuits. But neither *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019), nor *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277 (11th Cir. 2019), involved a conspiracy. So they had no occasion to consider whether *Lozman* is instructive for claims against individual defendants based on conspiracy.

over the past decade." And she doesn't rely on "the statements and motivations of the particular [officials]." *Nieves*, 139 S. Ct. at 1727.

Second, Sylvia's evidence supports the proposition that *Nieves* requires: She "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech [or conduct] had not been." *Ibid.* Evidence that an arrest has never happened before (*i.e.*, a negative assertion) can support the proposition that there are instances where similarly situated individuals not engaged in the same protected activity hadn't been arrested (*i.e.*, a positive inference). *See Negative Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Evidence suggesting that an alleged fact does not exist, such as a witness's testifying that he or she did not see an event occur. . . ."). Context determines whether a negative assertion amounts to positive evidence. *See ibid.* (explaining that "a negative assertion will sometimes be considered positive evidence").[7]

Here, common sense dictates that Sylvia's negative assertion amounts to direct evidence that similarly situated individuals not engaged in the same sort of protected activity had not been arrested. *See Lund v. City of Rockford*, 956 F.3d 938, 945 (7th Cir. 2020) ("We must consider each set of facts as it comes to us, and in assessing whether the facts supply objective proof of retaliatory treatment, . . . common sense must prevail."). After all,

---

[7] It's of course true that comparative evidence can be *better* evidence than the negative assertions Sylvia provides because it more directly supports the point. *See Negative Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Negative evidence is generally regarded as weaker than positive evidence because a positive assertion that a witness saw an event is a stronger statement than an assertion that a witness did not see it."). But this doesn't mean that Sylvia's evidence doesn't support the required proposition that other similarly situated individuals not engaged in the same sort of protected activity hadn't been arrested. Simply put, just because Sylvia's evidence requires an inference doesn't mean it isn't evidence sufficient to meet *Nieves*. Our system accepts circumstantial evidence all the time.

government employees routinely—with intent and without it—take stacks of papers before, during, and after meetings. Under the Conspirators' interpretation of Texas Penal Code § 37.10(a)(3), there should be dozens if not hundreds of arrests of officeholders and staffers during every single legislative biennium—to say nothing of the hundreds if not thousands of arrests during the more-frequent local-government meetings across the State. On the record before us, however, there has been only one: Sylvia's.

In short, Sylvia properly alleged that the Conspirators jailed her for petitioning the government. *Nieves* is no barrier to her retaliatory-arrest claim. She has therefore pleaded a constitutional violation and satisfied the first prong of the qualified-immunity inquiry.

B.

The second prong is whether the Conspirators violated Sylvia's clearly established rights. This question is admittedly harder. You might reasonably think that if the First Amendment clearly establishes anything, it's that the government cannot arrest a citizen for her petition. That's obviously been true since at least the English Declaration of Rights in 1689. *See* 1 Wm. & Mary, ch. 2, 6 Statutes of the Realm 143 ("It is the Right of the Subjects to petition the King, and all Commitments and Prosecutions for such Petitioning are Illegal."); *see also* Declaration and Resolves of the First Continental Congress Resolution 8 (Oct. 14, 1774) ("That they have a right peaceably to assemble, consider of their grievances, and petition the king; and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal.").

On the other hand, in *Reichle v. Howards*, 566 U.S. 658 (2012), the Court held that we cannot define the right against retaliatory arrests "as a broad general proposition." *Id.* at 665 (quotation omitted). Rather, "the right in question is not the general right to be free from retaliation for one's speech,

but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right." *Ibid.* So *Reichle* might lead you to think that Sylvia cannot surmount the clearly-established-law prong.

On yet another hand, however, *Reichle* (like *Nieves*) involved a split-second decision to arrest an unruly person in a public place. *See id.* at 661 (describing the incident, in which Howards assaulted the Vice President, lied about it, and was arrested). Neither *Reichle* nor *Nieves* involved secret, deliberative, and intentional conspiracies to jail an elderly woman for petitioning the government. And it's not at all clear that we should apply the same qualified-immunity inquiries for First Amendment cases, Fourth Amendment cases, split-second-decisionmaking cases, and deliberative-conspiracy cases. *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (statement of Thomas, J., respecting the denial of certiorari) (criticizing the "one-size-fits-all doctrine"). As Justice Thomas has observed, "why should [speech-suppressing] officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting? We have never offered a satisfactory explanation to this question." *Id.* at 2422; *see also* Andrew S. Oldham, *Official Immunity at the Founding*, 46 Harv. J.L. & Pub. Pol'y --- (forthcoming) (manuscript at 26–27), https://ssrn.com/abstract=3824983. That further suggests that the Conspirators here should not get the same qualified-immunity benefits that cops on the beat might get.

And in any event, *Reichle* was not the Court's last word on the topic. In *Lozman*, the Court supplied the holding that *Reichle* said was theretofore missing—namely, it held that retaliatory-arrest plaintiffs *can* prevail even when their arrests are supported by probable cause. 138 S. Ct at 1955. Moreover, as noted above, *Lozman* and our case involve materially identical

No. 21-50276

facts. And the Supreme Court decided *Lozman* in 2018—the year before the Conspirators jailed Sylvia for petitioning the government. So that might lead you to think that the Conspirators were given every conceivable form of fair notice—in a string of authority from 1689 to 2018—that their conduct was flagrantly violative of the First Amendment. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (Qualified immunity's "focus is on whether the officer had fair notice that her conduct was unlawful.").[8] Whatever the right answer to this question might be, my distinguished colleagues in the majority have no occasion to reach it. *See ante*, at 5–11 (resolving the case on prong one of the qualified-immunity inquiry). So I see little use in saying more about it.

    With deepest respect, I dissent.

---

[8] The timing of *Nieves* does nothing to help the Conspirators. The Court decided that case before Sylvia's arrest, and hence the Conspirators were on notice that probable cause would not necessarily defeat a retaliatory-arrest claim. *See* 139 S. Ct. at 1727–28 (so holding); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[T]he court must decide whether the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*." (emphasis added)). It's no answer to say, as the Conspirators do, that they *started* conspiring to retaliate against Sylvia before *Nieves* was decided. Only the "plainly incompetent" would hatch a retaliatory plan before that decision and stick to it afterwards. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).