# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CASE NO. 21-50276

SYLVIA GONZALEZ,
*Plaintiff–Appellee,*

v.

EDWARD TREVINO, II, MAYOR OF CASTLE HILLS, sued in his individual capacity; JOHN SIEMENS, CHIEF OF THE CASTLE HILLS POLICE DEPARTMENT, sued in his individual capacity, ALEXANDER WRIGHT, sued in his individual capacity,
*Defendants–Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION NO. 5:20-CV-01151-DEA, HON. DAVID ALAN EZRA

BRIEF OF *AMICI CURIAE* THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER AND THE NATIONAL POLICE ACCOUNTABILITY PROJECT IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING EN BANC

Lauren Bonds
NATIONAL POLICE ACCOUNTABILITY PROJECT
2022 St. Bernard Ave., Suite 310
New Orleans, LA 70116

Devi M. Rao
RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3490
devi.rao@macarthurjustice.org

*Counsel for the National Police Accountability Project*

*Counsel for the Roderick & Solange MacArthur Justice Center*

## CERTIFICATE OF INTERESTED PERSONS

(1)     Case No. 21-5026, *Gonzalez v. Trevino, et al.*

(2)     The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Defendants-Appellants** | **Counsel for Defendants-Appellants** |
|---|---|
| Edward Trevino, II; John Siemens; and Alexander Wright | Denton Navarro Rocha Bernal & Zech<br>Scott Michael Tschirhart<br>Lowell F. Denton |

| **Plaintiff-Appellee** | **Counsel for Plaintiff-Appellee** |
|---|---|
| Sylvia Gonzalez | Institute for Justice<br>Anya Bidwell<br>Patrick Jaicomo<br>William Aronin |

| **Amici Curiae** | **Counsel for Amici Curiae** |
|---|---|
| Roderick & Solange MacArthur Justice Center; and National Police Accountability Project | Devi M. Rao<br>Lauren Bonds |

 */s/Devi M. Rao*
Devi M. Rao
*Attorney of Record for*
*Amici Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...........................................i

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF *AMICI CURIAE* ............................................ 1

SUMMARY OF THE ARGUMENT ........................................3

ARGUMENT ........................................................................4

I.     This Case Raises An Issue Of Exceptional Importance Because Illegal Arrests for Disfavored Speech Is a Serious and Systemic Problem That Disproportionately Impacts Communities of Color............................................................4

     A.     Retaliatory Arrests for Perceived "Anti-Police" Speech. ........ 4

     B.     "Contempt of Cop" Arrests.....................................................6

     C.     Retaliatory Arrests for Political Opposition to Local Government Leaders................................................................8

     D.     Communities of Color Are Disproportionately Impacted by Retaliatory Police Action. .................................................... 11

CONCLUSION ....................................................................15

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. City of Costa Mesa,*
    718 F.3d 800 (9th Cir. 2013) ............................................................. 10

*Ahmad v. City of St. Louis,*
    No. 17-cv-2455, 2017 WL 5478410 (E.D. Mo. Nov. 15,
    2017) ...................................................................................................... 6

*Fernandes v. City of Jersey City,*
    No. 2:16-cv-7789, 2017 WL 2799698 (D.N.J. June 27,
    2017) .................................................................................................... 10

*Henneberg v. City of Newark,*
    No. 13-cv-05238, 2017 WL 1493006 (N.D. Cal. Apr. 26,
    2017) .................................................................................................... 10

*Holley v. Town of Carp Hill,*
    351 F. Supp. 3d 1359 (M.D. Ala. 2018) ......................................... 9, 10

*Lozman v. City of Riviera Beach,*
    138 S. Ct. 1945 (2018) .......................................................................... 9

*Mitchell v. Kirchmeier,*
    28 F.4th 888 (8th Cir. 2022) ............................................................. 14

*Mitchell v. Morton County Sheriff Kyle Kirchmeier,*
    No. 1:19-cv-149, 2020 WL 8073625 (Dec. 10, 2020) ........................ 14

*Nieves v. Bartlett,*
    139 S. Ct. 1715 (2019) .......................................................................... 3

**Other Authorities**

Bryan Stevenson, *A Presumption of Guilt: The Legacy of
    America's History of Racial Injustice, in* Policing the
    Black Man: Arrest, Prosecution, and Imprisonment
    (Angela J. Davis ed., 2017) ............................................................... 12

Christopher Klein, *How Selma's 'Bloody Sunday' Became a Turning Point in the Civil Rights Movement*, HISTORY (July 18, 2020) ..................................................................... 13

Fed. R. App. P. 29 ............................................................. 1

JOHN J. FARMER, JR. & PAUL H. ZOUBEK, FINAL REPORT OF THE STATE POLICE INTERVIEW TEAM (1999) ......................... 7

Justin Hansford & Meena Jagannath, *Ferguson to Geneva: Using the Human Rights Framework to Push Forward a Vision for Racial Justice in the United States After Ferguson*, 12 HASTINGS RACE & POVERTY L. J. 121 (2015) ................... 5

Justin Hansford, *The First Amendment Freedom of Assembly as a Racial Project*, 127 YALE L.J. FORUM 685 (2018) ........................ 11

Letter from Thomas E. Perez, Assistant Attorney General, to William R. Jones, Counsel, Maricopa County Sheriff's Office (Dec. 15, 2011) ................................................. 11

Matthew Heins, *Contempt of Cop is Not a Legal Charge and Neither is Trumping Up Other Charges to Support an Arrest!*, LAW ENFORCEMENT ACTION FORUM (Michigan Municipal League), Mar. 2018 ............................................ 6

Nick Estes, OUR HISTORY IS THE FUTURE: STANDING ROCK VERSUS THE DAKOTA ACCESS PIPELINE, AND THE LONG TRADITION OF INDIGENOUS RESISTANCE (2019) ............................ 13, 14

Ron Chernow, GRANT (2017) ................................................. 12

Sara Bullard, FREE AT LAST: A HISTORY OF THE CIVIL RIGHTS MOVEMENT AND THOSE WHO DIED IN THE STRUGGLE (1993).............. 12

Taylor Branch, AT CANAAN'S EDGE: AMERICA IN THE KING YEARS 1965-68 (2006) ......................................................... 13

Transcript of Oral Argument, *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) (No. 17-21)............................................ 9

U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF
  THE BALTIMORE CITY POLICE DEPARTMENT (2016) ........................ 5, 6, 8

U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF
  THE FERGUSON POLICE DEPARTMENT (2015) .................................. 4, 5, 8

U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF
  THE NEWARK POLICE DEPARTMENT (2014) ........................................ 7, 8

## INTEREST OF *AMICI CURIAE*[1]

The Roderick and Solange MacArthur Justice Center (MJC) is a not-for-profit organization founded by the family of J. Roderick MacArthur to advocate for civil rights and a fair and humane criminal justice system. MJC has represented clients facing myriad civil rights injustices, including issues concerning police misconduct, the rights of protestors, and compensation for those whose constitutional rights have been violated. MJC has an interest in the sound and fair administration of the criminal justice system, and in ensuring those who have been treated unfairly by that system are able to bring suit to vindicate their rights.

The National Police Accountability Project (NPAP) was founded in 1999 by members of the National Lawyers Guild to address allegations of misconduct by law enforcement officials through coordinating and assisting civil rights lawyers representing their victims. NPAP has approximately six hundred attorney members practicing in every region of the United States, who regularly represent protesters who advocate on

---

[1] Pursuant to FRAP 29, no counsel for either party authored this brief in whole or in part. No one other than *amici* made monetary contributions to its preparation or submission.

1

behalf of controversial issues. NPAP provides training and support for these attorneys and other legal workers, public education and information on issues related to law enforcement and accountability, and resources for non-profit organizations and community groups. NPAP appears regularly as *amicus curiae* in cases such as this one presenting issues of particular importance for its member lawyers and their clients.

*Amici* file this brief to situate this case within the broader context of retaliatory police action.

## SUMMARY OF THE ARGUMENT

As explained in Ms. Gonzalez's petition for rehearing en banc—and in Judge Oldham's dissent—the panel majority incorrectly interpreted *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), in a way that will make it almost impossible to assert the important exception set out in that case.

To understand the full consequences of the majority's erroneous interpretation of the *Nieves* exception, it is critical to situate Ms. Gonzalez's experience in the broader context of retaliatory law enforcement actions against individuals for exercising their First Amendment rights to free speech and to petition their government. These retaliatory actions are, sadly, common—and fall disproportionately on communities of color.

An appropriate interpretation of the *Nieves* exception is critical in protecting First Amendment rights, and to stop retaliatory arrests of protestors and the civically-engaged like Ms. Gonzalez. The Court should grant en banc review on this issue of exceptional importance.

# ARGUMENT

## I.  This Case Raises An Issue Of Exceptional Importance Because Illegal Arrests for Disfavored Speech Is a Serious and Systemic Problem That Disproportionately Impacts Communities of Color.

### A. Retaliatory Arrests for Perceived "Anti-Police" Speech.

Retaliatory arrests against individuals on the basis of their speech is all-too-common. In particular, and notwithstanding the First Amendment, some police departments systematically arrest people in retaliation for their perceived "anti-police" speech. For example, in a 2015 report, the Department of Justice found that "suppression of speech" by the Ferguson, Missouri Police Department (FPD) "reflects a police culture that relies on the exercise of police power—however unlawful— to stifle unwelcome criticism." U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE FERGUSON POLICE DEPARTMENT 28 (2015) (hereinafter "Ferguson DOJ Report").[2] The report noted that despite a settlement agreement and a consent decree in two separate cases regarding protest activities, "it appears that FPD continues to interfere with individuals' rights to protest and record police activities." *Id.* at 27.

---

[2]    https://www.justice.gov/sites/default/files/opa/press-releases/attach ments/2015/03/04/ferguson_police_department_report.pdf.

For instance, on February 15, 2015, the six-month anniversary of the shooting death of Michael Brown, when "protesters stood peacefully" in front of the police department, police responded with the retaliatory arrests of six people, including two people—one in a wheelchair—for capturing the action on camera. *Id.* at 27-28.[3]

The DOJ made similar findings regarding the Baltimore Police Department (BPD): "BPD violates the First Amendment by retaliating against individuals engaged in constitutionally protected activities. Officers frequently detain and arrest members of the public for engaging in speech the officers perceive to be critical or disrespectful." U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE BALTIMORE CITY POLICE DEPARTMENT 9 (2016) (hereinafter "Baltimore DOJ Report").[4] The report also detailed BPD officers improperly interfering with individuals' rights to videotape arrests and other police activity and using

---

[3] FPD also responded to protected First Amendment activity with excessive force, including tear gas and rubber bullets. Justin Hansford & Meena Jagannath, *Ferguson to Geneva: Using the Human Rights Framework to Push Forward a Vision for Racial Justice in the United States After Ferguson*, 12 HASTINGS RACE & POVERTY L. J. 121, 131 (2015).

[4] https://www.justice.gov/crt/file/883296/download.

unreasonable force against individuals who engage in speech critical of law enforcement. *See id.* at 118-20.

Likewise, the St. Louis Police Department responded with retaliatory arrests to peaceful protests triggered by the acquittal of Officer Jason Stockley for the fatal shooting of Anthony Lamar Smith. *Ahmad v. City of St. Louis*, No. 17-cv-2455, 2017 WL 5478410, at *1 (E.D. Mo. Nov. 15, 2017), *modified on other grounds*, *Ahmad v. City of St. Louis*, 995 F.3d 635 (8th Cir. 2021). When St. Louis police encountered these protestors, who were expressing frustration with both the verdict and "broader issues, including racism and the use of force by police officers," officers declared an "unlawful assembly" and carried out mass arrests.

### B. "Contempt of Cop" Arrests.

One particularly common form of retaliation is known as the "contempt of cop" arrest. In these cases, a police officer has probable cause to believe an offense has occurred, but the suspect's speech, perceived as disrespectful, is the real reason for the arrest or citation. Matthew Heins, *Contempt of Cop is Not a Legal Charge and Neither is*

*Trumping Up Other Charges to Support an Arrest!*, LAW ENFORCEMENT
ACTION FORUM (Michigan Municipal League), Mar. 2018 at 1.[5]

A report by then-New Jersey Attorney General John J. Farmer
identified "contempt of cop" citations as a "problem" in "law enforcement
nationwide." JOHN J. FARMER, JR. & PAUL H. ZOUBEK, FINAL REPORT OF
THE STATE POLICE INTERVIEW TEAM 93-94 (1999).[6] "Simply put," the
report explained, "it is the tendency for certain police officers to approach
the public with an attitude that they, the officer, are in no way to be
challenged or questioned." *Id.* at 94.

Consistent with this evaluation, the DOJ found that Newark Police
Department officers often arrest people for contempt of cop, identifying
"numerous instances of the [department's] inappropriate responses to
individuals who engage in constitutionally protected First Amendment
activity, such as questioning or criticizing police actions." U.S. DEP'T OF
JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE NEWARK POLICE

---

[5]   http://www.mml.org/insurance/risk_resources/publications/leaf_news
letter/2018_06.pdf.

[6] https://www.state.nj.us/lps/Rpt_ii.pdf.

DEPARTMENT 13 (2014).[7] In one instance, for example, "an individual was arrested after he questioned officers' decision to arrest his neighbor." *Id.*

Similarly, in the Ferguson Report, the DOJ concluded that "officers frequently make enforcement decisions based on what subjects say, or how they say it," "are quick to overreact to challenges and verbal slights," and "belie[ve] that arrest is an appropriate response to disrespect." Ferguson DOJ Report at 25.

Likewise, the DOJ report about the Baltimore Police Department recounted an incident where a young African-American man was ordered to leave an area because he "'had no respect for law enforcement,'" and then was arrested fifteen minutes later for failure to obey. Baltimore DOJ Report at 116. These are mere samples of the arrests that happen on a daily basis across the country.

## C. Retaliatory Arrests for Political Opposition to Local Government Leaders.

A common tactic employed by public officials, notably members of city councils, is to target citizens, like Ms. Gonzalez, who use their First Amendment rights to criticize and hold accountable their government

---

[7] https://www.justice.gov/sites/default/files/crt/legacy/2014/07/22/newark _findings_7-22-14.pdf.

leaders. Fane Lozman, the plaintiff in *Lozman v. City of Riviera Beach*, [138 S. Ct. 1945, 1949](#) (2018), for example, was "an outspoken critic" of his local city council. In 2006, Lozman attended a city council meeting and— "[a]s he had done on earlier occasions and would do more than 200 times over the coming years"—"stepped up to the podium to give remarks" about government corruption. *Id.* A councilmember interrupted Lozman, and told him to stop speaking, but he continued. *Id.* A police officer then asked Lozman to leave the podium, but Lozman refused and kept speaking. *Id.* The councilmember directed the officer to "carry him out," and "[t]he officer handcuffed Lozman and ushered him out of the meeting." *Id.* at 1949-50. At oral argument Chief Justice Roberts described the video of the arrest as "chilling." Transcript of Oral Argument at 34, *Lozman*, [138 S. Ct. 1945](#) (No. 17-21).[8]

Another instance of city-council retaliation occurred in *Holley v. Town of Carp Hill*, [351 F. Supp. 3d 1359](#) (M.D. Ala. 2018). Frank Holley, the former mayor of Carp Hill, was a frequent critic of then-mayor Danny

---

[8] https://www.supremecourt.gov/oral_arguments/argument_transcripts/ 2017/17-21_ljgm.pdf. The video of the encounter is also available at https://www.supremecourt.gov/media/video/mp4files/Lozman_v_Riviera Beach.mp4.

Evans, and would criticize him publicly at city council meetings. *Id.* at 1361-62. Evans told officers to target Holley in retaliation; the police chief testified that Evans told him to "set [Holley] up" and to do "anything you can do to arrest that b----ard, put his old a-- in jail." *Id.* at 1362. Holley was eventually arrested for a traffic violation and subsequently sued the town, alleging his arrest was in retaliation for his speech. *Id.* at 1363.

Other examples from the caselaw abound. *See, e.g.*, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 809 (9th Cir. 2013) (speaker at city council arrested following his refusal to comply with councilmember's order to stop talking); *Henneberg v. City of Newark*, No. 13-cv-05238, 2017 WL 1493006, at *2-3 (N.D. Cal. Apr. 26, 2017) (frequent critic of city council arrested at a luncheon); *Fernandes v. City of Jersey City*, No. 2:16-cv-7789, 2017 WL 2799698, at *3 (D.N.J. June 27, 2017) (citizen who criticized government officials at city council meetings forcibly removed from the podium).

The Department of Justice has recognized this problem. In a 2011 report, DOJ determined that the Maricopa County, Arizona Sheriff's Office "sought to silence individuals who have publicly spoken out and participated in protected demonstrations against the [Office's] policies

and practices" regarding immigration. Letter from Thomas E. Perez, Assistant Attorney General, to William R. Jones, Counsel, Maricopa County Sheriff's Office, at 13 (Dec. 15, 2011).[9] During two separate meetings of the County Board of Supervisors, deputies arrested several individuals who expressed criticism of the Maricopa County Sheriff's Office (MSCO). *Id.* at 14. The DOJ concluded: "The arrests and harassment undertaken by MCSO have been authorized at the highest levels of the agency and constitute a pattern of retaliatory actions intended to silence MCSO's critics." *Id.* Thus, what Ms. Gonzalez experienced is, unfortunately, not an outlier.

### D. Communities of Color Are Disproportionately Impacted by Retaliatory Police Action.

Retaliatory actions by police officers have historically disproportionately affected people of color—effectively meaning that the First Amendment does not protect everyone's speech equally. *See* Justin Hansford, *The First Amendment Freedom of Assembly as a Racial Project*, 127 YALE L.J. FORUM 685, 688 (2018). Black Americans have long been retaliated against for speaking out against abusive state and police

---

9    https://www.justice.gov/sites/default/files/crt/legacy/2011/12/15/mcso_findletter_12-15-11.pdf.

practices. For example, following the end of the Civil War, a group of African Americans attempted to convene a conference to amend the state constitution to extend voting rights to Black men and repeal the racially discriminatory "Black Codes"—a prototypical political activity. Bryan Stevenson, *A Presumption of Guilt: The Legacy of America's History of Racial Injustice*, *in* POLICING THE BLACK MAN: ARREST, PROSECUTION, AND IMPRISONMENT 10 (Angela J. Davis ed., 2017). When the delegates convened, a "white mob, backed by police, many of them Confederate veterans," responded with unyielding violence. Ron Chernow, GRANT 574-75 (2017). Following the attack, 37 people were killed and at least 160 were wounded. *Id.*

Police retaliation against Black protestors continued into the Civil Rights Era. Although the examples of police retaliation are countless, the tragic events at Selma highlight police animus towards Black political speech. Hundreds of protestors crossed the Edmond Pettus Bridge in order to protest the murder of Jimmie Lee Jackson by state police. Sara Bullard, FREE AT LAST: A HISTORY OF THE CIVIL RIGHTS MOVEMENT AND THOSE WHO DIED IN THE STRUGGLE 430 (1993). On the opposite end of the bridge, a wall of Alabama state troopers, billy clubs in hand, waited for

the protestors. Christopher Klein, *How Selma's 'Bloody Sunday' Became a Turning Point in the Civil Rights Movement*, HISTORY (July 18, 2020).[10] Alabama governor George Wallace commanded his state troopers to "use whatever measures [were] necessary to prevent a march." *Id.* The police attacked the peaceful protestors, firing tear gas, trampling protestors with horses, and beating them with their clubs. Taylor Branch, AT CANAAN'S EDGE: AMERICA IN THE KING YEARS 1965-68, at 51 (2006).

Native American protest has historically drawn a similar level of police resentment. In 1890, federal troops and the national guard were sent to the Northern Plains to dismantle the Ghost Dance movement. Nick Estes, OUR HISTORY IS THE FUTURE: STANDING ROCK VERSUS THE DAKOTA ACCESS PIPELINE, AND THE LONG TRADITION OF INDIGENOUS RESISTANCE 127-28 (2019). The Ghost Dance was an inter-tribal resistance movement that protested the Dawes Act, which allowed the Federal government to seize and break-up tribal lands. *Id.* at 120. In order to stifle the movement, the federal government's Seventh Cavalry

---

[10] https://www.history.com/news/selma-bloody-sunday-attack-civil-rights-movement.

massacred between 270 to 300 native people, most of whom were women and children. *Id.* at 128.

Government retaliation against Native American protest continues into the modern day. Take, for example, the facts of a recent Eighth Circuit case. Marcus Mitchell, an enrolled member of the Navajo Nation, went to North Dakota to protest the construction of the Dakota Access Pipeline, which local tribes opposed because it would endanger their water supply and environment, disrupt cultural sites, and threaten historic treaty land. *Mitchell v. Morton County Sheriff Kyle Kirchmeier*, No. 1:19-cv-149, 2020 WL 8073625, *1 (Dec. 10, 2020). While Mitchell was peacefully protesting with his hands raised in the air, officers shot him with lead-filled bean bag rounds. *Mitchell v. Kirchmeier*, 28 F.4th 888, 894 (8th Cir. 2022). Mitchell was hit in three places, and one round shattered his left eye socket and became lodged in his eye, requiring surgery. *Id.* The Eighth Circuit recently reversed the district court's grant of qualified immunity to the officers that used excessive force against Mitchell, and to a sergeant who failed to intervene, and also allowed his related municipal liability claim to proceed. *Id.* at 899-902.

In short, police officers across jurisdictions have historically abused—and continue to abuse—their ability to arrest individuals, particularly people of color, who dare question the police or others in positions of authority.

Indeed, Ms. Gonzalez's case showcases the serious risks faced by people of color for criticizing and opposing their political leaders. Sylvia Gonzalez was a community organizer who ran for city council on a promise that she would create a non-binding citizens' petition demanding the removal of city manager. ROA.169. She then became the first Hispanic councilwoman elected in the history of Castle Hills. *Id.* The retaliatory action she experienced is consistent with the historical evidence: people of color who dare speak out against those in power are frequently subject to unlawful punishment for their speech.

## CONCLUSION

For the foregoing reasons, and those in Appellee's petition for rehearing en banc, the Court should grant en banc review to correct the panel majority's disastrously narrow interpretation of *Nieves*, which will have enduring consequences for our civil society.

15

Respectfully submitted,

Devi M. Rao
*Counsel of Record*
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3490
devi.rao@macarthurjustice.org

*Counsel for the Roderick &*
*Solange MacArthur Justice Center*

Lauren Bonds
NATIONAL POLICE ACCOUNTABILITY
  PROJECT
2022 St. Bernard Ave., Suite 310
New Orleans, LA 70116

*Counsel for the National Police*
*Accountability Project*

# CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

All counsel of record are registered CM/ECF users, and will be served by the appellate CM/ECF system.


Date: October 3, 2022                    */s/ Devi M. Rao*
                                         Devi M. Rao

# CERTIFICATE OF COMPLIANCE

Pursuant to <u>Fed. R. App. P. 29(b)(4)</u>, I certify that:

1.      This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(b)(4)</u> because this brief contains 2,588 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

2.      This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and <u>5th Cir. R. 32.1</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook typeface.


Date: October 3, 2022                    */s/ Devi M. Rao*
                                         Devi M. Rao