# United States Court of Appeals for the Fifth Circuit

_____

No. 21-50276
_____

Sylvia Gonzalez,

*Plaintiff—Appellee*,

*versus*

Edward Trevino, II, Mayor of Castle Hills, sued in his individual capacity; John Siemens, Chief of the Castle Hills Police Department, sued in his individual capacity; Alexander Wright, sued in his individual capacity,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-1151
_____

ON PETITION FOR REHEARING EN BANC

Before Barksdale, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the

No. 21-50276

request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

In the en banc poll, six judges voted in favor of rehearing (Smith, Higginson, Ho, Duncan, Oldham and Douglas), and ten voted against rehearing (Richman, Jones, Stewart, Elrod, Southwick, Haynes, Graves, Willett, Engelhardt and Wilson).

No. 21-50276

James C. Ho, *Circuit Judge*, dissenting from denial of rehearing en banc:

"[T]he most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." Laurence H. Silberman, *Hoover's Institution*, Wall St. J., July 20, 2005. And not just heinous—it's also unconstitutional.

The First Amendment is supposed to stop public officials from punishing citizens for expressing unpopular views. In America, we don't allow the police to arrest and jail our citizens for having the temerity to criticize or question the government. If the freedom of speech meant anything to our nation's Founders, it meant that "it was beyond the power of the government to punish speech that criticized the government in good faith." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 309 (2017). "Criticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

But it falls on the judiciary to ensure that the First Amendment is not reduced to a parchment promise.[1] Few officials will admit that they abuse the coercive powers of government to punish and silence their critics. They're often able to invent some reason to justify their actions. So courts must be vigilant in preventing officers from concocting legal theories to arrest citizens for stating unpopular viewpoints.

---

[1] *See*, *e.g.*, The Federalist No. 48, at 313 (James Madison) (Clinton Rossiter ed., 1961) ("a mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient guard against . . . encroachments"); *Considering the Role of Judges Under the Constitution of the United States: Hearing Before the S. Comm. on the Judiciary*, S. Hrg. 112–137, at 6–7 (2011) (statement of Justice Scalia) ("Every banana republic has a bill of rights. . . . The bill of rights of the former [Soviet Union] was much better than ours. . . . Of course, they were just words on paper, what our Framers would have called 'a parchment guarantee.'").

No. 21-50276

That's why the Supreme Court has made clear that a citizen "need not prove the absence of probable cause to maintain a claim of retaliatory arrest" under the First Amendment. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1955 (2018). There's no "unyielding requirement to show the absence of probable cause" to state a claim of First Amendment retaliation. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019).

And for good reason. There are countless situations in which "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* As a result, there's a meaningful "'risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman*, 138 S. Ct. at 1953).

What's more, this risk has never been more prevalent than today. "[C]riminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something." *Id.* at 1730 (Gorsuch, J., concurring in part and dissenting in part). "[T]he average busy professional in this country wakes up in the morning, goes to work, comes home, takes care of personal and family obligations, and then goes to sleep, unaware than he or she likely committed several crimes that day." Harvey A. Silverglate, THREE FELONIES A DAY: HOW THE FEDS TARGET THE INNOCENT xxx (2009). "[P]rosecutors can find some arguable federal crime to apply to just about any one of us, even for the most seemingly innocuous conduct." *Id. See also* Paul Larkin & Michael Mukasey, *The Perils of Overcriminalization*, HERITAGE FOUNDATION, Feb. 12, 2015.

In other words, the opportunity for public officials to weaponize the criminal justice system against their political adversaries has never been greater.

No. 21-50276

So it's up to the judiciary to make sure that those who hold positions of power stay in their lane. Courts must make certain that law enforcement officials exercise their significant coercive powers to combat crime—not to police political discourse.

That's what the Supreme Court recently reminded us in *Lozman* and *Nieves*. Unfortunately, the panel majority failed to uphold these principles and instead granted qualified immunity to the defendants in this case. I respectfully dissent from the denial of rehearing en banc.

# I.

At this stage of the proceedings, we accept as true the following allegations as stated in the complaint:

Sylvia Gonzalez is an elderly retiree from Castle Hills, Texas. Like many of her fellow citizens, she was unhappy about some aspect of her local government. But unlike most, she decided to do something about it. She ran for city council against a well-connected incumbent. And she won.

During the campaign, Gonzalez heard numerous complaints about the city manager, whom the mayor had appointed to handle the day-to-day business of running the city.

After taking office, Gonzalez organized a petition that called for the reinstatement of the previous city manager—and thus, implicitly, the dismissal of the incumbent city manager. The petition noted that the current city manager "talked about [fixing] the streets," but had not "fixed a single street." By contrast, the previous city manager "oversaw, from start to finish, over a dozen street projects."

More than three hundred Castle Hills residents signed Gonzalez's petition calling for the city council to "FIX OUR STREETS" by removing the current city manager.

At Gonzalez's first city council meeting as an elected member, a resident of Castle Hill submitted Gonzalez's petition to the mayor. This triggered a contentious debate about the current city manager. The debate spilled over to the next day.

At the end of the next day's meeting, Gonzalez picked up various papers off the table and placed them in her binder. While Gonzalez was chatting after the meeting, the police captain tapped her on the shoulder and explained that the mayor (who had sat next to her during the meeting) wanted to have a word. The police captain escorted Gonzalez to the mayor. The mayor then asked Gonzalez where the petition was. She answered: "Don't you have it? It was turned into you yesterday." At the mayor's prompting, Gonzalez looked for the petition in her binder and found it among other papers that had been beside her on the table. As Gonzalez handed the petition back to him, the mayor said: "You probably picked it up by mistake."

The mayor, the police chief, and a special detective then hatched a plan to charge Sylvia with a crime in order to remove her from office. The police chief deputized his close friend, a private attorney, as a special detective to investigate Gonzalez. Following the investigation, the special detective filed an arrest affidavit alleging that Gonzalez had committed the crime of "intentionally destroy[ing], conceal[ing], remov[ing], or otherwise impair[ing] the verity, legibility, or availability of a governmental record." Tex. Pen. Code Ann. § 37.10(a)(3).

"The plan then entered its next phase: the arrest. [The] 'Special Detective' . . . lived up to his title. He did three special things to ensure that Sylvia would be arrested and jailed rather than simply asked to appear before a judge." *Gonzalez v. Trevino*, 42 F.4th 487, 496 (5th Cir. 2022) (Oldham, J., dissenting). First, the special detective got a warrant rather than a summons.

(A summons is standard for nonviolent offenses—only a warrant can result in jailtime.)  Second, the special detective circumvented the district attorney by using a procedure normally reserved for emergencies or violent felonies: He walked the warrant directly to a magistrate.  Third, the special detective prevented Gonzalez from using the satellite booking function, which facilitates booking, processing, and releasing nonviolent offenders without jailtime.  Gonzalez's warrant did not go through any of the traditional channels, so it wasn't in the satellite booking system.

Gonzalez turned herself in as soon as she learned about the warrant for her arrest.  She then spent a day in jail, handcuffed to a cold metal bench and wearing an orange jail shirt.

During her jailtime, she was forced to forgo use of a restroom—as a modest 72-year-old retiree, she was not comfortable using a restroom that had no doors and no toilet paper.  In addition, her jailers refused to let her stand up and stretch her legs.

The district attorney ultimately dropped the charges.  But only after Gonzelez's name and photo were splashed across local media for days.

The arrest left Gonzalez so traumatized that she resolved never to organize a petition or to run for office ever again—precisely what her tormenters-in-office conspired to achieve.

## II.

A retaliatory arrest can give rise to a First Amendment claim even if the arrest was supported by probable cause. *See, e.g.*, *Lozman*, 138 S. Ct. at 1955 ("Lozman need not prove the absence of probable cause to maintain a claim of retaliatory arrest"); *Nieves*, 139 S. Ct. at 1727 (same).

To illustrate why respect for the First Amendment demands that probable cause pose no impenetrable barrier to a retaliation claim, the

Supreme Court has offered the following simple example: "[A]t many intersections, jaywalking is endemic but rarely results in arrest." *Nieves*, 139 S. Ct. at 1727. So "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.*

Accordingly, a plaintiff may proceed on a First Amendment retaliatory arrest claim so long as he "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

It's not difficult to imagine different forms of evidence that might be used to prove this point.

To take one example, a plaintiff might identify particular individuals who had engaged in the same acts, but not the same speech, and yet were not arrested—what the panel majority called "comparative evidence." 42 F.4th at 492.

But alternatively, a plaintiff might present evidence that the underlying statute had *never* been used under analogous circumstances, despite the fact that such conduct is commonplace—what the panel dissent called "negative evidence." *Id.* at 506 (Oldham, J., dissenting).

The latter is what Gonzales presented here. As the panel dissent noted, "government employees routinely—with intent and without it—take stacks of papers before, during, and after meetings." *Id.* Gonzalez made clear in her complaint that she would present objective evidence that no one has ever been arrested for doing what she did. She reviewed all of the charges brought in the county during the last decade and concluded that "neither the misdemeanor tampering statute, nor its felony counterpart, has ever been

used to criminally charge someone for allegedly trying to steal a nonbinding or expressive document, such as the petition at issue in this case." As she explained in her complaint:

> Of 215 grand jury felony indictments obtained under the tampering statute at issue in this case, not one had an allegation even closely resembling the one mounted against [Gonzalez]. By far the largest chunk of the indictments involved accusations of either using or making fake government identification documents: altered driver's licenses, another person's ID, temporary identification cards, public safety permits, green cards, or social security numbers. A few others concerned the misuse of financial information, like writing of fake checks or stealing banking information. The rest are outliers, but all very different from Sylvia's situation. They concern hiding evidence of murder, cheating on a government-issued exam, and using a fake certificate of title, among others.

So as the panel dissent concluded, "common sense dictates that [Gonzalez's] negative assertion amounts to direct evidence that similarly situated individuals not engaged in the same sort of protected activity had not been arrested." *Id.* Gonzalez showed that county officials decided to arrest her, even though they usually exercise their discretion not to make such arrests. And that's all *Nieves* requires.

Yet the panel majority dismissed Gonzalez's claim on the ground that she "does not offer evidence of other similarly situated individuals who mishandled a government petition but were not prosecuted under Texas Penal Code § 37.10(a)(3)." *Id.* at 492. According to the majority, *Nieves* "requires some comparative evidence." *Id.* at 493.

But that misreads *Nieves*. Recall the jaywalking example: "an individual who has been vocally complaining about police conduct is arrested for jaywalking." 139 S. Ct. at 1727. As the panel dissent explains, "[i]t's not clear that there will always (or ever) be available comparative evidence of

9

jaywalkers [who] weren't arrested. Rather, the retaliatory-arrest-jaywalking plaintiff always (or almost always) must appeal to the commonsense proposition that jaywalking happens all the time, and jaywalking arrests happen virtually never (or never)." *Gonzalez*, 42 F.4th at 503 (Oldham, J., dissenting). I agree that it makes little sense to read *Nieves* to require comparative evidence.

### III.

The panel majority's reading of *Nieves* is not just mistaken—it also creates an admitted split with the Seventh Circuit. *See* 42 F.4th at 492–93 ("We recognize that one of our sister circuits has taken a broader view of [*Nieves*] . . . . We do not adopt this more lax reading.").

As the Seventh Circuit has observed, *Nieves* does not "adopt[] a rigid rule that requires, in all cases, a particular form of comparison-based evidence." *Lund v. City of Rockford*, 956 F.3d 938, 945 (7th Cir. 2020). Rather, *Nieves* requires "objective evidence"—and in determining what counts, "common sense must prevail." *Id.*

Under *Nieves*, comparator evidence is certainly sufficient, but it's not necessary for a retaliation claim to proceed. All *Nieves* requires is "objective evidence that [the plaintiff] was arrested when otherwise similarly situated individuals . . . had not been." 139 S. Ct. at 1727. A plaintiff can point to specific individuals who engaged in the same prohibited conduct yet were not arrested. But a plaintiff can alternatively point to other evidence that the conduct, though common, rarely results in arrest. This latter type of evidence works because "[e]vidence that an arrest has never happened before (i.e., a negative assertion) can support the proposition that there are instances where similarly situated individuals . . . hadn't been arrested." *Gonzalez*, 42 F.4th 487 at 505 (Oldham, J., dissenting).

No. 21-50276

## IV.

"[T]he First Amendment's guarantee of free speech is not just a legal doctrine. It represents the most fundamental value in American democracy. A national commitment to uninhibited political speech is a crucial aspect of our country's culture." Laurence H. Silberman, *Free Speech Is the Most Fundamental American Value*, Wall St. J., Sep. 30, 2022. So "[u]nless all American institutions are committed to free political speech, I fear the strain on the First Amendment's guarantees will become unbearable." *Id.*

We should've championed these principles and granted rehearing en banc in this matter. Instead, we have chosen to leave the decision of the panel majority intact.

But that decision not only misreads *Nieves* and thereby creates an admitted circuit split. It also under-protects the American people against violations of their First Amendment rights. As a result, citizens in our circuit are now vulnerable to public officials who choose to weaponize criminal statutes against citizens whose political views they disfavor.

Moreover, I fear that this latest en banc denial continues to take our court down the wrong path. Our circuit's en banc decisions continue to get the First Amendment not only wrong, but backwards.

We deny First Amendment protection when it comes to sincere acts of political advocacy—but we invoke First Amendment protection when it comes to demonstrated acts of political corruption. *Compare*, *e.g.*, *Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018), *with United States v. Hamilton*, 46 F.4th 389, 398 n.3 (5th Cir. 2022). We presume corruption where we should presume innocence—but we excuse corruption where the evidence is extravagant. *See id. But see United States v. Hamilton*, _ F.4th _, _ (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing en banc) ("[O]ur circuit is getting the First Amendment backwards in case after case.

11

The freedom of speech guaranteed to every citizen protects political advocacy—not corruption."); *Zimmerman v. City of Austin*, 888 F.3d 163, 164 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc).

We reject our citizens when they claim a First Amendment right to criticize their government—but we embrace public officials who claim a First Amendment right not to be criticized by others. *Compare*, *e.g.*, *Gonzalez*, 42 F.4th 487, *with Wilson v. Houston Community College System*, 955 F.3d 490 (5th Cir. 2020), *rev'd*, 142 S. Ct. 1253 (2022). *But see Wilson v. Houston Community College System*, 966 F.3d 341, 345 (5th Cir. 2020) (Ho, J., dissenting from denial of rehearing en banc) ("The First Amendment guarantees freedom *of* speech, not freedom *from* speech. It secures the right to criticize, not the right *not* to be criticized.").

We worry about preserving the rights of violent protesters—but not the rights of people of faith. *Compare*, *e.g.*, *Doe v. Mckesson*, 947 F.3d 874 (5th Cir. 2020) (eight votes to revive First Amendment defense of violent protest), *with East Texas Baptist University v. Burwell*, 807 F.3d 630 (5th Cir. 2015) (only four votes to revive religious liberty challenge to the Affordable Care Act). *See also Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc) (denying relief to evangelical Christian students who were prohibited from expressing their faith to other students at any time while at school).[2]

---

[2] Compare our en banc decision in *Morgan* with our en banc rehearing denial in *Oliver v. Arnold*, 19 F.4th 843 (5th Cir. 2021). In both cases, public school students expressed religious views that school officials sought to ostracize. In *Morgan*, we sided with the school. In *Oliver*, we sided with the student. Religious liberty experts have described *Oliver* as "the Fifth Circuit's redemption for its mistake in *Morgan*." Hiram Sasser, *Fifth Circuit Gets It Right in* Arnold *Decision*, Federalist Soc'y, Dec. 20, 2021, https://fedsoc.org/commentary/fedsoc-blog/fifth-circuit-gets-it-right-in-arnold-decision. But our decision in *Oliver* triggered sharp rebuke and opposition from seven members of the court. *See*, *e.g.*, 19 F.4th at 859, 862 (Duncan, J., dissenting from denial of rehearing en

## V.

Even worse, we're not just getting the First Amendment backwards. We're also getting qualified immunity backwards. Just compare the denial of en banc rehearing here with some of our other recent en banc decisions.

We grant qualified immunity to officials who trample on basic First Amendment rights—but deny qualified immunity to officers who act in good faith to stop mass shooters and other violent criminals. *Compare, e.g., Gonzalez*, 42 F.4th 487; *Morgan*, 659 F.3d 359 (granting qualified immunity to principal who prohibited students from expressing their faith while at school), *with Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc) (denying qualified immunity to police officers who took lethal action against a student who was about to shoot up his high school); *Winzer v. Kaufman County*, 940 F.3d 900 (5th Cir. 2019) (denying rehearing en banc in case against police department for lethal actions taken during active shooting incident).

Accordingly, officers who punish innocent citizens are immune—but officers who protect innocent citizens are forced to stand trial. Officers who deliberately target citizens who hold disfavored political views face no accountability—but officers who make split-second, life-and-death decisions to stop violent criminals must put their careers on the line for their heroism. *But see Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.) ("But why should university officers, who have

---

banc) (disparaging decision as a "dumpster fire" and urging federal judges to defer to school boards).

Similarly, in *Sambrano v. United Airlines, Inc.*, 2022 WL 486610 (5th Cir. 2022), the panel majority allowed people of faith to seek preliminary injunctive relief to vindicate their religious objections to a COVID-19 vaccine mandate. We denied en banc rehearing. But as in *Oliver*, our decision in *Sambrano* triggered sharp rebuke and opposition from four members of the court. *See Sambrano*, 2022 WL 486610, at *28 (Smith, J., dissenting) (disparaging decision as an "orgy of jurisprudential violence"); *Sambrano v. United Airlines, Inc.*, 45 F.4th 877 (5th Cir. 2022).

time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?").

Put simply, "we grant immunity when we should deny—and we deny immunity when we should grant." *Horvath v. City of Leander*, 946 F.3d 787, 795 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part). Indeed, ours is the rare circuit that has been summarily reversed by the Supreme Court for both wrongly granting *and* wrongly denying qualified immunity. *See Tolan v. Cotton*, 572 U.S. 650 (2014), *summarily rev'g* 713 F.3d 299 (5th Cir. 2013); *Mullenix v. Luna*, 577 U.S. 7 (2015), *summarily rev'g* 773 F.3d 712 (5th Cir. 2014); *Taylor v. Riojas*, 141 S. Ct. 52 (2020), *summarily rev'g* 946 F.3d 211 (5th Cir. 2020).[3]

This pattern is not just disconcerting to me. It's also disconcerting to a broad coalition of civil rights organizations—including organizations that disagree with one another over countless issues, but agree that there's something amiss about our court's approach to qualified immunity and the First Amendment. In *Morgan*, for example, the amicus coalition led by the First Liberty Institute included the American Center for Law and Justice, the American Civil Liberties Union, the Becket Fund for Religious Liberty, the Cato Institute, Christian Legal Society, the Claremont Institute, the National Association of Evangelicals, and Wallbuilders.[4]

---

[3] The Tenth Circuit appears to be the only other circuit that the Supreme Court has summarily reversed in recent years for both wrongly granting and wrongly denying qualified immunity. *See White v. Pauly*, 580 U.S. 73 (2017), *summarily rev'g* 814 F.3d 1060 (10th Cir. 2016); *Sause v. Bauer*, 138 S. Ct. 2561 (2018), *summarily rev'g* 859 F.3d 1270 (10th Cir. 2017); *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021), *summarily rev'g* 981 F.3d 808 (10th Cir. 2020).

[4] A similarly diverse group of amici appears in *Villarreal v. City of Laredo*, 52 F.4th 265 (5th Cir. 2022), including such nationally respected civil rights organizations and public interest groups as Alliance Defending Freedom, Americans for Prosperity

No. 21-50276

These respected public interest organizations no doubt have limited resources that they must deploy wisely. Yet they all took the time and effort to make their views known to our court in *Morgan*. "It is no accident that several religiously affiliated organizations have filed amicus briefs in support of [the First Amendment] claim" and "uniformly decry the potential for misuse" of government power to "harass" and "uniquely burden religious organizations." *Whole Woman's Health v. Smith*, 896 F.3d 362, 370, 373–74 (5th Cir. 2018).

\* \* \*

It's heartwarming that, in these divisive times, an ideologically diverse group of leading organizations can still unite behind the cause of freedom of speech and tolerance for conflicting viewpoints. It's unfortunate that our court was unable to unite behind that same cause today. I respectfully dissent from the denial of rehearing en banc.

---

Foundation, the Cato Institute, the Constitutional Accountability Center, the Electronic Freedom Foundation, the First Liberty Institute, and the Institute for Justice.